IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ANCHORBANK, FSB, and
ANCHORBANK UNITIZED FUND,
  on behalf of itself and all plan participants,

                        Plaintiffs,                        OPINION and ORDER

    v.

                                                                 09-cv-610-slc

CLARK HOFER,

                        Defendant.

---

        Plaintiffs Anchorbank, fsb and Anchorbank Unitized Fund contend that defendant Clark Hofer violated §§ 9(a)(2) and 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78i(a)(2) and 78j(b)) and Wis. Stat. § 551.501 and breached his fiduciary duties when he allegedly engaged in coordinated trading of the Fund's shares to manipulate the market price of the stock held by the Fund.  The logistics of the alleged scheme are described below.  Jurisdiction is present under 28 U.S.C. §§ 1331 and 1367.  Now before the court is defendant's motion to dismiss plaintiffs' amended complaint.  For the reasons stated below, I am granting the motion in part and staying a final decision on the rest.

        Defendant contends that plaintiffs have failed to allege sufficient details in their complaint to satisfy the heightened pleading standard of Fed. R. Civ. P. 9 and have failed to satisfy the strict pleading requirements for federal securities fraud claims under the Private Securities Litigation Reform Act of 1996 (PSLRA), 15 U.S.C. § 78u-4(b).  I conclude that plaintiffs have satisfied Rule 9 with respect to the details of the alleged fraud, but I am granting defendant's motion to dismiss–*without* prejudice–with respect to plaintiffs' federal claims because the allegations do not support an inference of loss causation or reliance as required to proceed on their §§ 9(a) and 10(b) claims.  Because this is the first dismissal for pleading deficiencies, I

am giving plaintiffs one chance to amend the complaint and address these concerns. I am staying the decision on defendant's motion to dismiss plaintiffs' state law claims because it is not proper to address the merits of those claims at this stage. If plaintiffs cannot mend the pleading deficiencies in their federal claims, then this court may decline to exercise supplemental jurisdiction over the state claims under 28 U.S.C. § 1367(c).

Plaintiffs' amended complaint and its attachments[1] allege these facts:

## ALLEGATIONS OF FACT

### I. The Parties

Plaintiff AnchorBank, fsb is a federal stock savings association located in Madison, Wisconsin. Plaintiff AnchorBank Unitized Fund is an investment option within AnchorBank's 401(k) retirement plan. Defendant Clark Hofer has been the regional lending manager at plaintiff AnchorBank since December 2006, and in that capacity he had fiduciary duties to Anchorbank, including the duties of care and loyalty. (The amended complaint is unclear about whether Hofer still is employed at AnchorBank; on June 29, 2009, he was placed on an unpaid leave of absence pending an investigation into the alleged collusive trading scheme at issue in this case.)

### II. The Fund

Plaintiff AnchorBank Unitized Fund is a unitized stock fund that AnchorBank offers its employees as part of its 401(k) plan. The Fund is comprised of cash and the company stock of

---

[1] *See Hecker v. Deere & Co.*, 556 F.3d 575, 582-83 (7th Cir. 2009) (court may consider attachments to complaint without converting motion to dismiss into motion for summary judgment).

Anchor BanCorp of Wisconsin, the holding company of plaintiff AnchorBank. Participants investing in Fund shares are investing in both the stock and cash portions of the Fund.

During the time period relevant to this case, the Fund was required to maintain a cash to stock ratio of 5-11% with a target of 8%. Fund participants, including Hofer, were notified of the Fund's cash ratio requirements. When Fund participants buy or sell Fund shares, the Fund settles those purchases and sales each night, using the closing price of the Fund. If the Fund falls outside the allowable cash to stock ratio after settling the purchases and sales, the Fund Manager must buy or sell Anchor BanCorp stock on the open market over the next trading day or days in order to achieve an appropriate cash to stock ratio. Thus, if the night's totals leave the Fund with too much cash, the Fund Manager must buy some stock, and if the totals leave the Fund with too little cash, the Fund Manager must sell some stock.

**III.  The Trading**

Starting in September 2008, Hofer started engaging in coordinated purchases and sales of Fund shares with two other employees of AnchorBank (identified in the amended complaint as simply "A" and "B"). In the complaint, plaintiffs describe this as:

> a collusive strategy of buying and selling [AnchorBank Unitized Fund] shares within the fund which directly affected the [Anchor BanCorp of Wisconsin] stock price ("Collusive Trading Scheme") and which eventually resulted in large gains to those co-conspirators and losses to the Fund and the other Fund participants. . . . Hofer . . . was the mastermind or leader of the group.

Dkt. 19 at 4 (¶¶ 18 & 19).

From September 2008 until June 2009, Hofer traded together 36 times with A, B or both. During the same time period, there were other trades in which "A" made a purchase or

sale within one trading day of the others. "Prior to or contemporaneously with" each of the transactions, Hofer communicated in person with A and by phone or email with B. Typically, Hofer would tell A and B that he intended to trade that day and would "instruct or encourage them to do the same." In addition, Hofer and B would forward each other electronic copies of the confirmations they received for their respective trading. Hofer monitored the stock price of Anchor BanCorp during the work day using his AnchorBank computer, often keeping certain financial websites up from market open to market close. Hofer actively monitored and tracked the Fund share price as well.

The volume of sales and purchases by Hofer, A and B increased over time from September 2008 to June 2009. For example, on September 3, 2008, total trading volume of the group was 12,997 shares (sold). By March 18, 2009, the total trading volume was 189,018 shares (sold) and the next day trading volume was 237,176 shares (bought). The volume increased even more after this point. On May 12, 2009, total trading volume of the group was 376,655 shares (sold) and On June 22, 2009, total trading volume of the group was 666,388 shares. The breaking point was on June 29, 2009, when Hofer and the others attempted to purchase 1,943,984 Fund shares. AnchorBank started an investigation and placed Hofer on an unpaid leave of absence.

Among other dates in which Hofer and A or B or both made coordinated trades of Fund shares, on March 19, 2009, Hofer and B bought 237,000 Fund shares, when the closing price for Anchor BanCorp stock was $0.82 a share. *See* Am. Cpt., Exhs. A and B, dkts. 19-2 and 19-3. On March 23, 2009, Hofer and B sold 67,000 shares, after the closing price of the stock had gone up to $1 a share. *Id.* Likewise, on June 22, 2009, Hofer, A and B bought 668,000 Fund

shares when closing price was $0.85 a share for Anchor BanCorp stock and on June 23, 2009, Hofer and B sold 588,000 (and a day later A sold 79,000) Fund shares; by then the stock's closing price had risen to $1.41 a share. *Id.*

Usually, when Hofer and A or B or both made coordinated trades of Fund shares, they made up 100% or nearly 100% of the total volume on those days that they traded. Am. Cpt., Exh. C., dkt. 19-3. From September 2008 to June 2009, the closing price of Fund shares declined fairly steadily from $9.43 to $0.49 while the closing price of Anchor BanCorp's stock shares declined steadily from $8.73 to $1.10. Am. Cpt., Exh. B and C, dkts. 19-3 and 19-4. The Fund share closing price decreased at a higher rate than the Anchor BanCorp stock, starting in September 2008 with a value of $1.50 more than the stock price and ending in June 2009 with a value of $0.50 less than the stock price. Am. Cpt., Exh. D, dkt. 19-5.

ANALYSIS

**I. Basic Pleading Requirements for Allegations of Fraud**

The parties agree that plaintiffs' §§ 9(a)(2) and 10(b) claims involve allegedly fraudulent conduct and therefore must comply with Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud," which includes describing "the who what, when, where, and how" of the alleged fraud. *Borsellino*, 477 F.3d at 507 (citations omitted). In this case, plaintiffs allege that Hofer committed fraud by making coordinated transactions to buy and sell Fund shares. Plaintiff's theory is not that the trades themselves should be considered fraudulent statements—they were real trades after all, even if they were for manipulative purposes—but rather that they operated as a fraud on others by creating trading activity of the Anchor BanCorp stock. *Cf. Stoneridge*

5

*Investment Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 158 (2008) ("[c]onduct itself can be deceptive"); *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 476 (1977) ("manipulation" refers to "practices . . . that are intended to mislead investors by artificially affecting market activity"). Hofer does not argue that such trading could not be considered a sort of fraud.

Hofer contends that plaintiffs do not provide enough particulars about the circumstances of the fraud to satisfy Rule 9 because: (a) they do not describe the details of the communications between Hofer and A and B regarding the sales; (b) they do not specify the exact timing of those communications; and (c) they do not provide a complete picture of the trades of Hofer, A and B during the time of the alleged conspiracy. These arguments miss the mark.

Plaintiffs are not required to identify the specific words Hofer allegedly used or the exact times these words were spoken. The purported fraud is the manipulative, coordinated trading, not the communications between the alleged coconspirators. Plaintiffs' allegations that Hofer "instruct[ed]" or "encourage[d]" the others to trade on the same day sufficiently notify Hofer of the nature of the conversations. Likewise, it is enough that these conversations are identified as "prior to" or "contemporaneous with" the trades, even if the dates are not clear. That said, plaintiffs have provided more details about the timing of those communications, stating that they were typically about trading on "that day." Am. Cpt., ¶ 32, dkt. 19.

As for Hofer's concern that the allegations do not preclude the possibility that Hofer and A and B engaged in unrelated trades on other days, so what? The timing and number of same-day transactions are identified in the complaint only to bolster the inference that the trading was intended to be collusive and manipulative. Even if Hofer and the others were included in some

6

daily unrelated trades, this would not undermine the inference that the coordinated trades were manipulative because, as to those trades, Hofer "encouraged" simultaneous trading.

In sum, plaintiffs provide the "who, what, when where, and how" of the fraud, thereby satisfying Rule 9. The "who" is Hofer, A and B; the "what" is coordinated trading for the purpose of manipulating stock prices; the "when" is the specific dates listed in the chart in Exhibit A; the "where" is in the Fund; and the "how" is by closely monitoring stock and Fund share prices and then coordinating large joint sales and purchases.

## II. Additional Pleading Requirements for Federal Securities Fraud Claims

Section 9(a)(2) of the Securities Exchange Act of 1934 prohibits "effect[ing], alone or with one or more other persons, a series of transactions in any security registered on a national securities exchange . . . with respect to such security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others." Section § 10(b) of that Act is implemented by Rule 10b-5 (17 C.F.R. § 240.10b-5), which prohibits the use of any "device, scheme, or artifice to defraud," any material misrepresentations or omission or "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

Aside from alleging facts sufficient to establish the basic elements of each of these claims, plaintiffs must: (1) state with particularity sufficient facts to allow a "strong inference" to be drawn that the defendant acted with scienter, or an intent to deceive, 15 U.S.C. § 78u-4(b)(2); (2) allege plausible grounds to infer that the deceptive conduct caused an economic loss to

plaintiffs, *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341 (2005); 15 U.S.C. § 78u-4(b)(4); and (3) allege plausible grounds to infer that plaintiffs relied to their detriment on the alleged misleading statements or omissions, *Stark Trading v. Falconbridge Ltd.*, 552 F.3d 568, 569 (7th Cir. 2009) (citation omitted); *see also Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 206 (1976) (quoting Senate Report). Hofer contends that plaintiffs have failed to meet these three requirements.

**A. Scienter**

Hofer contends that plaintiffs have failed to allege sufficient facts to support a "strong inference" that Hofer acted with an intent to deceive. This contention does not go far. As I explained above, plaintiffs allege that Hofer "encouraged" and "instructed" A and B to buy or sell on the same days that he bought and sold. Plaintiffs allege that Hofer and the others engaged in 36 such group transactions of increasing volume. Hofer points out that all three of them only made same-day transactions on nine of those days, but this does not weaken the inference of fraud, especially in light of the fact that after many of the other 27 transactions, two actors would make a purchase on a given day and the third actor would make his or her transaction one day later. A hub-and-spoke conspiracy does not require every alleged coconspirator to participate in every alleged overt act. *Cf. United States v. Haynes*, 582 F.3d 686, 699 (7th Cir. 2009) (briefly glossing the concept in a criminal case).

Hofer argues that the timing and volume of the trades could just as easily support the inference that he and the others were "motivated by innocent and ordinary capitalistic motives." *Stark Trading v. Falconbridge Ltd.*, 2008 WL 153542, at *11 (E.D. Wis. Jan. 14, 2008). That could be true if no other facts were pled, but plaintiffs allege that Hofer instructed and

encouraged A and B to engage in same-day trading, evincing an intent to increase trading volume and thereby manipulate the market. The repetitive, upward ratcheting nature of this coordinated trading strengthens the inference. In sum, plaintiffs have sufficiently pled scienter.

### B. Loss Causation and Reliance

Loss causation and reliance are related but distinct concepts. "Loss causation" is simply an "exotic name" for "the standard rule of tort law that the plaintiff must allege and prove that, but for the defendant's wrongdoing, the plaintiff would not have incurred the harm of which he complains." *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 685 (7th Cir. 1990). Reliance, often referred to as "transaction causation," *Dura Pharmaceuticals*, 544 U.S. at 341 (citation omitted), involves the requirement that a plaintiff allege and prove that he or she "would not have engaged in the transaction" had there been no fraud. *LHLC Corp. v. Cluett, Peabody & Co., Inc.*, 842 F.2d 928, 931 (7th Cir. 1988). (In this case, the relevant "transaction" could be either trading with Fund shares or trading with Anchor BanCorp stock.)

This is where plaintiffs' allegations fall short. First, with respect to loss causation, plaintiffs' theory is that the coordinated trades of large numbers of Fund shares forced the Fund to trade on the open market, causing excessive trading activity of shares of Anchor BanCorp stocks. Plaintiff's allegations allow an inference that the increased stock trading volume that occurred shortly after the coordinated transactions had an impact on the market. Exhibit B shows that, on more than one occasion after early 2009, the stock price of Anchor BanCorp had a sudden revival following coordinated purchases despite a general decline in price, such as the revival from March 19, 2009 to March 23, 2009 and from June 22, 2009 to June 23, 2009.

Although Hofer identifies other problems with Anchorbank's financial circumstances that might have affected the stock price at certain times over the trading period, none of this would negate an inference that the increased trading volume following Hofer's trading had some impact on prices, at least on a few of the occasions identified.

However, as Hofer points out, there are other details missing. Nowhere do plaintiffs explain how many shares of stock the Fund manager had to trade on the open market in response to the coordinated trading. Plaintiffs seem to think a favorable inference can be extracted from the exhibits they submit, but I am not persuaded. The exhibits show that there was increased trading on the market on days after coordinated trades occurred and that the coordinated trades for Fund shares were often near 100% of the trading activity for Fund shares. However, nothing explains how the amounts traded relate to the Fund's required cash balance requirements or how much of the increased trading volume was caused by the Fund manager.

It should be a simple matter for the Fund to detail its trading on the open market for any given day and describe whether that trading was related to its obligation to maintain a certain cash balance range. Plaintiffs have not done this. Without such information, it is not reasonable to infer that Hofer is to blame for the increased market activity that occurred after the coordinated trades.

Next, and more important, the complaint does not suggest a reasonable basis for inferring that plaintiffs ever relied on the fraud to their detriment. First, there is no suggestion that Anchorbank was injured at all. As for the Fund, the allegations actually undermine any inference that the Fund relied to its detriment on the fraud. As Hofer points out, the Fund was allegedly *required* to purchase or sell its stock on the market when it came outside the acceptable cash

10

balance range. There is no suggestion that the Fund ever made purchases or sales on the market relying on the mistaken notion that Hofer and the others "were on to something." Instead, the Fund's transactions appear to have been undertaken mechanically pursuant to its duties. In other words, had the purchases by Hofer, A and B been made by coincidence and for legitimate purposes, the Fund still would have been required to make the same trades on the market–or so it seems for all plaintiffs' allegations. Plaintiffs have not suggested that the Fund ever had any power to engage in discretionary trading or even choose *when* to trade to restore the proper cash to stock ratio that Hofer allegedly disturbed.

Plaintiffs' argument that the Fund is entitled to a presumption of reliance does not help them. Although in *Basic, Inc. v. Levinson*, 485 U.S. 224, 242-43 (1988), the Court agreed that traders in an impersonal and efficient market should be entitled to a presumption of reliance, it also noted that such a presumption can be rebutted by a "showing that severs the link between the alleged [fraud] and . . . [the plaintiff's] decision to trade at a fair market price." *Id.* at 248. Plaintiffs themselves have rebutted the presumption in their amended complaint, stating that the Fund purchased pursuant to its rules, not in reliance on the fairness of the market price.

Plaintiffs add that other Fund investors may have relied on the market price as well, and that they should be entitled to the presumption. That may be, but plaintiffs have not shown that the Fund has standing to sue for those participants under securities laws. *Cf. Peoria Union Stock Yards Co. Retirement Plan v. Penn Mutual Life Insurance Co.*, 698 F.2d 320, 326 (7th Cir. 1983) (ERISA plan did not have standing to sue under securities laws although it had standing to sue under ERISA laws).

11

Even if they were to have standing, plaintiffs have not identified any particular Fund participants who relied on the fraud to their detriment. Although plaintiffs state generally that "other Fund participants" may have relied upon the stock, what plaintiffs needed to do was identify one or more particular Fund participants (other than Hofer or A or B) who bought or sold Fund shares during the relevant time period. In this case, that time period would be during those periods of time in which coordinated transactions appear to have swayed the market.

Because plaintiffs have failed to allege sufficient facts to support an inference that there was loss causation or that they relied to their detriment on the alleged fraud, I will grant Hofer's motion to dismiss plaintiffs' federal securities fraud claims.

The next question is whether plaintiffs should have another opportunity to amend their complaint to address these problems. Hofer argues that dismissal of the federal claims should be with prejudice because plaintiffs already have amended their complaint once after Hofer filed an earlier motion to dismiss that identified problems with plaintiffs' allegations. *See* dkt. 7. However, the court did not decide that original motion to dismiss because it was mooted before it came under advisement. Until now, plaintiffs had not received a judicial determination as to the adequacy of their allegations. Although in some cases it is obvious that any attempt to cure pleading shortcomings would be futile, this is not such a case. Therefore, I am providing plaintiffs a final opportunity to amend. *See Zimmerman v. Logemann*, 09-cv-210-slc, 2009 WL 4407205, at *13 (W.D. Wis. Nov. 30, 2009) (although plaintiffs had filed amended complaint in response to undecided motion to dismiss, court gave plaintiffs "one more opportunity" to amend complaint after granting motion to dismiss amended complaint).

**III. State Law Claims**

My conclusion that both of plaintiff's federal claims should be dismissed leaves the state law claims untouched. Although Hofer raises other challenges to the state law claims, I will not address them at this juncture. The basis for subject matter jurisdiction over the state law claims is 28 U.S.C. § 1367, which authorizes exercising supplemental jurisdiction over state law claims forming part of the same case or controversy as federal claims before the court. Once federal claims are dismissed from a case, the "general rule" is that the court should decline to exercise supplemental jurisdiction over the state law claims under § 1367(c). *Wright v. Associated Insurance Companies, Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994).

It would be improvident to determine the fate of plaintiffs' state law claims before determining the fate of their federal claims. I will stay a decision on Hofer's motion to dismiss plaintiffs' state law claims until plaintiffs file a second amended complaint and the parties brief the question whether that pleading satisfies the pleading requirements. If Hofer decides not to challenge the adequacy of the federal claims in the second amended complaint, then he may simply renew his existing motion to dismiss the state law claims and the court will take the renewed motion under advisal immediately.

ORDER

IT IS ORDERED that:

1. Defendant's motion to dismiss, dkt. 39, is GRANTED with respect to plaintiffs Anchorbank, fsb's and Anchorbank Unitized Fund's claims that defendant violated §§ 9(a) and 10(b) of the Securities Exchange Act of 1934:

    (A) These claims are DISMISSED WITHOUT PREJUDICE. Not later than March 26, 2010, plaintiffs may file a second amended complaint addressing the pleading deficiencies identified in this order or show cause why the court should not decline to exercise jurisdiction over the state law claims under 28 U.S.C. § 1367(c);

    (B) Not later than April 16, 2010 defendant may file a motion to dismiss any second amended complaint.

2. Defendant's motion to dismiss is STAYED with respect to plaintiff's claims that defendant violated Wis. Stat. § 551.501 and breached his fiduciary duties to Anchorbank.

Entered this 3rd day of March, 2010.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge