UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

ANCHORBANK, FSB, and PLUMB TRUST
COMPANY, on behalf of all AnchorBank Unitized
Fund participants,

                Plaintiffs,

vs.                                      Case No. 3:09-cv-00610-slc

CLARK HOFER,

                Defendant.

## SECOND AMENDED COMPLAINT

Plaintiffs, AnchorBank, fsb, and Plumb Trust Company, on behalf of all AnchorBank Unitized Fund participants, by and through their attorneys, Michael Best & Friedrich LLP, hereby allege as follows:

### THE PARTIES

1.      Plaintiff AnchorBank, fsb ("AnchorBank") is a federal stock savings association located at 25 West Main Street, Madison, Wisconsin 53703. AnchorBank allows its employees to invest in the AnchorBank Unitized Fund ("Fund"), which is an investment option within AnchorBank's 401(k) retirement plan.

2.      Plaintiff Plumb Trust Company ("Plumb Trust" or "Trustee") is an independent Wisconsin state-chartered trust company located at 1200 John Q. Hammons Drive, Madison, Wisconsin 53717. Plumb Trust is the Trustee for the Fund and is pursuing these claims on behalf of all Fund participants.[1]

---

[1] *Peoria Union Stock Yards Co. Retirement Plan v. Penn Mut. Life Ins. Co.,* 698 F.2d 320, 325-26 (7th Cir. 1983) (holding that trustees have standing to bring claims for violation of securities laws on behalf of plans and plan participants).

3.      Defendant Clark Hofer ("Defendant" or "Hofer") is an adult resident of Wisconsin and resides at 3733 Buckingham Drive, Janesville, Wisconsin 53546.

## JURISDICTION

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.  This is an action for damages regarding Defendant's acts and omissions in violation of the United States securities laws, Wisconsin securities laws, and breach of fiduciary duty.  This Court has jurisdiction over the subject matter of this action under the Securities Exchange Act of 1934 ("Securities Exchange Act"), 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.  The claims asserted herein, in part, arise under Sections 9(a), 9(e) and 10(b) of the Securities Exchange Act.  The Court also has jurisdiction over the state law claims under 28 U.S.C. § 1367.

5.      Venue is appropriate in the Western District of Wisconsin pursuant to 28 U.S.C. § 1391 because it is the judicial district where the Defendant and Plaintiffs are located and significant events relevant to this action took place.

## FACTS

6.      Hofer has been employed by AnchorBank since 1984, and has held the position of loan officer and Vice President-Regional Lending Manager at the Madison, Wisconsin location from July 1, 2002 through the present.

7.      By virtue of his position with AnchorBank, Hofer owed certain fiduciary duties to AnchorBank, including without limitation, the duties of care and loyalty.

8.      The Fund is a unitized stock fund AnchorBank offers to its employees as part of its 401(k) plan.  Among other benefits, by virtue of his employment with AnchorBank, Hofer was permitted to invest in the Fund.

9.      The Fund is comprised of Anchor BanCorp of Wisconsin, Inc. company stock ("ABCW") and cash.  Anchor BanCorp of Wisconsin is the holding company of AnchorBank, fsb.  Participants who invest in the unitized Fund shares ("AUF shares") are invested in both the stock and cash portions of the Fund, meaning that the participants own both ABCW shares and cash.

10.      The Fund's cash holdings allow the Fund to settle purchases and sells each night with Fund participants.  The Fund, the size of the cash portion, and the ABCW stock purchases and sales are managed by the Trustee, who is directed by AnchorBank, which is also the Fund Sponsor, and that works with AnchorBank's plan provider.

11.      The Fund is required to maintain a certain ratio of cash and ABCW stock, which, during the relevant time period, was typically a range of 5-11% with a "target" percentage of 8%.

12.      Fund participants, including Hofer, were notified of this requirement, as well as other information regarding how the Fund operates, through documents posted on AnchorBank's intranet.  Specifically, the information provided to Fund participants indicated that "[t]he percentage of cash in the Fund is usually between 1% and 3% of the account's total assets."

13.      Hofer also received this information via email on March 2, 2009.  While this information was accurate at the time the documents were posted, as the trading volume increased in early 2009, the percentage of cash in the Fund increased to a range of 8-11%.

14.      When Fund participants sell AUF shares, the dollar amount of which exceeds the AUF cash available in the Fund, the Trustee must sell ABCW stock on the open market to achieve the appropriate stock to cash balance in the Fund.  The Trustee is given discretion to determine the best means to rebalance the Fund, including the ability to spread the sales out over a number of days.

15.     This discretion is evidenced by the fact that the Trustee often did decide, in reliance on the market price of ABCW stock, to purchase or sell stock in smaller blocks over the course of several trading days in order to bring the cash-stock ratio back into balance.  The Trustee also had the discretion to decide where within the acceptable stock-cash range to maintain the Fund.  In addition, the Trustee had the discretion to delay or refuse to make trades in order to rebalance the Fund if the circumstances warranted.

16.     For example, where the fund has a target of 8% cash and a minimum cash level of 5%, if a Fund participant, or a group of Fund participants together, are able to sell AUF shares whose dollar value is more than 3-6% of the value of the Fund, the Trustee would be required to sell ABCW stock on the open market and bring the fund cash position back within the acceptable range.  In meeting this requirement, the Trustee has the discretion to determine, based on the ABCW market price and current market conditions, what would be best for the Fund in terms of when and how much ABCW stock to sell in order to get the Fund's stock-cash ratio back in balance and in terms of where within the range of the acceptable stock-cash ratio to maintain the Fund.

17.     When Fund participants buy AUF shares, the dollar amount of which exceeds the AUF liquidity target range ceiling of cash allowed in the Fund, the Trustee must buy ABCW stock on the open market to maintain the appropriate stock to cash balance in the Fund.  In meeting this requirement, the Trustee has the discretion to determine, based on the ABCW market price and current market conditions, what would be best for the Fund in terms of when and how much ABCW stock to purchase in order to get the Fund's stock-cash ratio back in balance and in terms of where within the range of the acceptable stock-cash ratio to maintain the Fund.

18.     For example, where the fund has a target of 8% cash and a ceiling of 11% cash, if a Fund participant, or a group of Fund participants together, are able to buy AUF shares whose dollar value is more than 3-6% of the value of the Fund, the Trustee will be required to buy ABCW stock on the open market within the next few trading days in order to bring the fund cash position back within the acceptable range of 8-11%.

19.     Thus, if a Fund participant, or a group of Fund participants together, are able to make trades that represent more than the cash or shares available in the Fund, the Trustee will be required to buy or sell ABCW stock on the open market at its discretion within the next few trading days.

20.     In or around June 2009, AnchorBank identified a collusive strategy of buying and selling AUF shares within the Fund by three of its employees that had begun in September 2008, which directly affected the ABCW stock price ("Collusive Trading Scheme"), and which eventually resulted in large gains to those co-conspirators and losses to the Fund and the other Fund participants.

21.     Hofer has been identified as one of the three co-conspirators involved in the Collusive Trading Scheme and was the mastermind or leader of the group.  The other two co-conspirators are identified herein as co-conspirator A and co-conspirator B.

22.     As background, the first step in the Collusive Trading Scheme involved the coordinated sale of AUF shares by Hofer and at least one of the other co-conspirators.  The AUF share price received by Hofer and the other co-conspirators was the closing price of the Fund. This triggered a payout from the Fund's cash reserves that evening to Hofer and the other co-conspirators.

23.     Because the Trustee was required to maintain a certain ratio of cash to ABCW stock in the AUF, the Trustee was forced to sell ABCW stock on the open market, at market prices, to replenish the Fund's cash reserves and maintain the proper stock/cash balance within the Fund.

24.     The Trustee had the ability to exercise its discretion in rebalancing the stock-cash ratio in the AUF, determining how many shares of ABCW to sell and when, in reliance on the ABCW market price and other market conditions.  As such, the Trustee often spread the stock sales out over a period of several trading days.

25.     The number of AUF shares being traded as a result of the collusive trading by the co-conspirators, in turn, caused the volume of ABCW stock sales to be relatively high as compared to the average daily trading volume of ABCW stock.  Given the large volume of stock being sold at or around the same time, the ABCW stock price declined.

26.     Hofer and the other two co-conspirators reaped all of the benefit of the coordinated sales transaction because they received a payout at a higher AUF share price – before any of the ABCW stock sales occurred, effectively lowering the price.  However, the result of this sell strategy to the remaining Fund participants was a two-sided loss.  First, the Fund participants suffered a loss when the ABCW stock price declined and the combination of cash and lower-priced ABCW stock resulted in a lower unitized or AUF share price.  Second, the loss to the Fund was compounded in that Hofer and the other co-conspirators received cash in exchange for their AUF shares at the higher price, but the Trustee was forced to sell the ABCW stock shares at a lower price to rebuild the cash reserves.

27.     The second step in the Collusive Trading Scheme involved a coordinated purchase of AUF shares by Hofer and at least one of the other co-conspirators.  The purchase

price received by Hofer and the other co-conspirators was the closing price of the Fund.  The

purchase triggered cash to flow into the Fund that evening.

28.    Again, because the Trustee was required to maintain a certain ratio of cash to

ABCW stock in the AUF, the Trustee was forced to purchase ABCW stock on the open market,

at market prices, to increase the Fund's stock holdings and maintain the proper stock/cash

balance within the Fund.

29.    The Trustee again had the ability to exercise its discretion in rebalancing the

stock-cash ratio in the AUF, determining how many shares of ABCW to purchase and when, in

reliance on the ABCW market price and other market conditions.  As such, the Trustee often

spread the stock purchases out over a period of several trading days.

30.    The number of AUF shares being traded as a result of the collusive trading by the

co-conspirators, in turn, caused the volume of ABCW stock purchases to be relatively high as

compared to the average daily trading volume of ABCW stock.  Given the large volume of stock

being purchased at or around the same time, the ABCW stock price increased.

31.    The net result is that Hofer and the other two co-conspirators did not suffer any of

the losses incurred by the Fund as a result of the coordinated sales, but they enjoyed all of the

gains as a result of the coordinated purchases.  In contrast, the other Fund participants, who were

not participating in the Collusive Trading Scheme, suffered the full amount of the loss as a result

of the coordinated sales.

32.    Similarly, the other Fund participants, in reliance on the artificially high or low

AUF share price and ABCW stock price, made purchase or sales decisions, which caused the

Fund, as a purchaser and seller of ABCW stock on the open market and at market prices, to

purchase and sell ABCW shares at prices that were artificially high or artificially low as a direct result of Hofer and the other co-conspirators' collusive trading activity.

33.    Prior to mid-September 2008, Hofer and the other two co-conspirators had only engaged in limited trading activity that occurred on the same day.  However, between September 2008 and the end of June 2009, 36 trades involving Hofer occurred in which at least two of the co-conspirators traded together.

34.    Hofer's 36 collusive trades with each of the other co-conspirators are broken down in the chart below.

|  | With A | With B | All 3 | Total |
|---|---|---|---|---|
| Hofer Transactions | 19 | 8 | 9 | 36 |

There were additional trades in which one of the co-conspirators made a purchase or sale within one trading day of the others.

35.    In addition, **Exhibit A**, which is attached hereto, lists each of the collusive trades, including those trades in which one of the co-conspirators engaged in similar trading activity within one day of the other two co-conspirators.  The chart also includes the volume of AUF shares traded by each of the co-conspirators, the total volume of trading in the Fund, and the total volume of trading of ABCW shares on that day.

36.    **Exhibit B**, which is attached hereto, lists each of the collusive trades and the subsequent purchases or sales of ABCW on the open market by the Trustee as a direct result of those trades.  Exhibit B also lists the ABCW price at which the Trustee purchased or sold that day.  Each of the trades by the Trustee listed on Exhibit B was initiated as part of the Trustee's duty to rebalance the Fund as a result of the Collusive Trading Activity, although the timing and quantity of such trades were within the Trustee's discretion in reliance on the ABCW market price.  Because the collusive trades were typically executed at or near the close of the trading

day, any trading activity by the Trustee on the open market to rebalance the AUF typically did not begin until the following trading day.

37. **Exhibit C**, which is attached hereto, lists the price and trading volume of ABCW stock from September 3, 2008 through June 30, 2009. The chart illustrates the marked increase in trading volumes in the days following the Collusive Trading Activity, particularly as the co-conspirators' holdings increased in 2009.

38. A comparison of Exhibit B to Exhibit C reveals that many times, the Trustee's trading activity, which occurred as a result of the Collusive Trading activity, represented between 30-60% of the entire trading volume of ABCW on that day.

39. **Exhibit D**, which is attached hereto, lists the close price and trading volume of AUF shares from September 17, 2008 through June 30, 2009, as well as the trading volume of Hofer and the other co-conspirators. The chart illustrates the effect Hofer and the other co-conspirators had on the Fund, including the fact that, much of the time, they represented 100% of the trading activity in the Fund that day, and the dramatic increase in the number of shares traded by each of the co-conspirators by the end of June 2009.

40. Prior to or contemporaneously with each of the coordinated transactions listed on **Exhibit A**, Hofer communicated with the other co-conspirators either in person (with co-conspirator A), by telephone (with co-conspirator B), or by email (with co-conspirator B). These communications were typically initiated by Hofer, who would inform the other co-conspirators that he intended to trade that day and instruct or encourage them to do the same.

41. In fact, on several occasions, Hofer forwarded an electronic copy of the Confirmation of Activity, or trade confirmation, to co-conspirator B via email, or *vice versa*, in an effort to confirm that the other bought or sold AUF shares that day as well.

- 9 -

42.     Hofer constantly monitored the ABCW stock price during the work day using his AnchorBank computer, often keeping certain financial websites up from market open to market close.

43.     Hofer also actively monitored and tracked the AUF share price.

44.     Hofer knew that his trading activity and the Collusive Trading Scheme had the ability to, and, in fact was intended to, affect the AUF share price and, indirectly, the ABCW price.

45.     This knowledge is evidenced by the fact that Hofer communicated with at least one other AnchorBank employee, who was not one of the co-conspirators, regarding his trading activity, pursuant to which he instructed that employee not to buy or sell on a day that Hofer intended to trade because it would "affect his price."

46.     Email correspondence between Hofer and co-conspirator B in April 2009 also explicitly recognizes that the Collusive Trading Scheme had the ability to and was affecting the AUF share price.

47.     While it is clear that Hofer and the other two co-conspirators were engaged in a pattern of collusive trading activity beginning in September 2008, it was not until early 2009 that they had amassed a large enough percentage of the value of the Fund such that they were able to measurably affect the ABCW share price.

48.     By knowingly and deliberately coordinating their trades, Hofer and the other two co-conspirators were able to increase their percentage ownership in the Fund to a level in which each of their trades were large enough to force the Trustee to buy or sell ABCW shares on the open market.

49.     In fact, once that level was reached and it became clear that the Collusive Trading Scheme was working, Hofer and the other co-conspirators' trading activity in March 2009 through June 2009 reflects much higher trading volumes and much more frequent trading.

50.     Through their collusive trading activity, Hofer and the other two co-conspirators were able to increase their collective percentage AUF share holdings to nearly 72% of the Fund's shares by June 29, 2009, without any significant cash contributions to their 401k.

51.     Hofer alone came to hold nearly 34% of the Fund's shares by June 29, 2009.

52.     The volume of trading activity by Hofer and the other two co-conspirators came to represent nearly 782% of (or nearly eight times) the daily trading activity of the ABCW stock by the end of June 2009.

53.     This was sufficient to impact the ABCW share price when the Trustee was required to purchase or sell ABCW shares on the open market.  Although the Trustee had discretion with regard to how many shares to trade and over what time period, such purchases or sales were required in order to maintain the proper cash to ABCW stock ratio following the large purchases or sales of AUF shares made by Hofer and the other two co-conspirators within the Fund.

54.     The communications among Hofer and the co-conspirators prior to or contemporaneously with each of the collusive trades, coupled with the frequency of coordinated trading activity, makes clear that this was not a coincidence, but was collusive and intentional.

55.     Hofer and the other two co-conspirators engaged in this series of coordinated purchase and sale transactions under the Collusive Trading Scheme until June 29, 2009, when Hofer and the other two co-conspirators collectively purchased approximately 1,943,986 AUF shares, which represented 100% of the trading volume in the AUF that day and 782% of the

- 11 -

ABCW average trading volume over the next 5 days.  Following this trade, AnchorBank suspended trading in Hofer and the other two co-conspirators' accounts.

56.     As evidenced by **Exhibits A-D**, there is a measurable correlation between these large, coordinated purchases and sales of AUF shares and the change in the ABCW stock price. The intentionally-coordinated, same-day trading of AUF shares by Hofer and the other two co-conspirators indirectly increased the trading volume of ABCW stock and demonstrably affected the ABCW stock price.

57.     These large, coordinated purchases and sales also resulted in losses to the Fund that caused a measurable decline in the AUF share price relative to the price of ABCW stock, which directly injured the other Fund participants.  In fact, Fund participants saw a decline in the AUF share price of 91% more than the decline in the ABCW stock price from September to the end of June 2009.  Attached hereto as **Exhibit E** is a chart comparing the AUF share price to the ABCW stock price.  Losses in the Fund result in a lower AUF price that is shown as a rapid decline relative to the price of ABCW stock.  Since May 13, 2009, the price of the Fund has been lower than the price of the ABCW stock.

58.     Hofer and the other two co-conspirators engaged in the Collusive Trading Scheme knowingly and with the intent to affect the ABCW stock price and, as a result, induce others to purchase and/or sell ABCW stock in order to increase their ability to profit as a result of their coordinated purchases and sales.

59.     Hofer was aware, through information disseminated by AnchorBank to all of its employees and specifically provided to Hofer by email, of the mechanics of the Fund, including the requirement that the Fund hold a certain percentage of cash.

60.     Thus, Hofer was also aware that it was critical to the Collusive Trading Scheme that he and the other co-conspirators trade in volumes large enough to force the Trustee to trade ABCW shares on the open market.

61.     As the value of the AUF shares declined over this period, from September 2008 to June 2009, from $11 a share to 49 cents a share (a 95% decline), Hofer and the other two co-conspirators were each able to increase the value of their Fund holdings by 230-270%.

62.     As a direct result of the Collusive Trading Scheme, Hofer and the other co-conspirators were able to create the appearance of heightened trading activity and artificially inflate and deflate the ABCW stock price by forcing the Trustee to purchase or sell ABCW shares on the open market to keep the AUF stock-cash ratio in balance.

63.     The Trustee, who had discretion to determine when and how many ABCW shares to purchase or sell in order to rebalance the stock-cash ratio in the AUF, relied on these artificially high or low prices in deciding how many ABCW shares to purchase or sell at a time and when to purchase or sell those shares.

64.     Also in reliance upon these artificially high or low prices and the appearance of heightened trading activity, other Fund participants, on whose behalf the Trustee is seeking relief, made the decision to purchase or sell AUF shares, which are comprised both of ABCW shares and cash, and which, in turn, caused the Trustee to purchase or sell additional ABCW shares on the open market in order to rebalance the AUF cash-stock ratio.

65.     For example, on June 8, 2009, Hofer and the other co-conspirators collectively sold approximately 580,254 AUF shares.  As a result, as set forth on Exhibit B, the Trustee began selling ABCW shares on the open market on June 9, 2009, to replenish the cash in the AUF, and continued to sell shares through June 22, 2009, for a total of 623,770 ABCW shares

sold. During that time period, the ABCW stock price dropped from approximately $1.40 per share to approximately $0.87 per share, and the AUF share price dropped from approximately $1.40 per share to $0.61 per share.

66.     In reliance on the ABCW market price, which is the primary component of the AUF share value, and the appearance of heightened trading activity, other plan participants also sold AUF shares during this time period, including Plan Participant M, who sold approximately 1,859 AUF shares on June 10 and 458 AUF shares on June 12, and Plan Participant H, who sold approximately 907 AUF shares on June 15 and 259 AUF shares on June 16. Both of these plan participants sold their AUF shares at a lower price as a direct result of the Collusive Trading Activity by Hofer and the other co-conspirators.

67.     AnchorBank was injured by virtue of the Collusive Trading Activity because the scheme made the company stock appear more volatile than it actually was and caused the stock price to drop, thereby diminishing the value of the company.

68.     AnchorBank was further injured by Hofer's failure to act in accordance with his fiduciary duties to AnchorBank, as his employer, including but not limited to the breach of the duty of loyalty for engaging in a course of conduct that benefited Hofer to the detriment of AnchorBank.

69.     On June 29, 2009, Hofer and the other two co-conspirators collectively purchased nearly 2,000,000 AUF shares. The Trustee, in its discretion, refused to initiate purchases of ABCW shares as a result of these trades and AnchorBank suspended all trading activity by Hofer and the other co-conspirators until it could investigate the matter.

70.     Hofer was placed on an unpaid leave of absence from his position at AnchorBank while AnchorBank investigated the Collusive Trading Scheme. Hofer remains on an unpaid disciplinary suspension.

### FIRST CAUSE OF ACTION
### VIOLATION OF SECTION 9(a), BROUGHT UNDER 9(e), OF THE SECURITIES EXCHANGE ACT

71.     AnchorBank incorporates all preceding paragraphs as if fully set forth herein.

72.     Hofer, singly and in concert, effected a series of transactions of securities in the Fund.

73.     Hofer, through these transactions indirectly purchased or sold securities being traded on a national exchange in that the purchase or sale of AUF shares required the Trustee to purchase or sell ABCW stock on a national securities exchange.

74.     This scheme, in which Hofer, and at least one other individual, coordinated their trading activity to occur within the same trading day, in order to create actual or apparent active trading in ABCW stock which, as a result, raised and lowered the price of ABCW stock.

75.     Hofer and the other co-conspirators knowingly engaged in the Collusive Trading Scheme with the intent that others would purchase or sell ABCW stock and further raise or lower the stock price to Hofer and the other co-conspirators' benefit.

76.     In reliance on the artificially high or low ABCW stock price, Fund participants, on whose behalf the Fund is seeking relief, made the decision to purchase or sell AUF shares, which, in turn resulted in purchases or sales of ABCW shares on the open market by the Trustee.

77.     By reason of the foregoing, Hofer directly violated Section 9(a)(2), as brought under Section 9(e) of the Securities Exchange Act in that he: (1) singly and in concert, effected a series of transactions of securities in the Fund; (2) which indirectly required the Trustee to

purchase ABCW stock on a national securities exchange; and (3) which created actual or apparent active trading in ABCW stock, which raised and lowered the price of ABCW stock.

## SECOND CAUSE OF ACTION
## VIOLATION OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT

78.    AnchorBank incorporates all preceding paragraphs as if fully set forth herein.

79.    Hofer, singly and in concert, directly and indirectly, engaged in a common plan, scheme, and course of conduct described herein, pursuant to which he knowingly and recklessly engaged in acts, transactions, practices and a course of business which involved manipulative or deceptive devices in connection with the purchase and sale AUF shares, and, consequently, of ABCW stock and operated as securities fraud.

80.    The purpose and effect of said scheme was to engage in an unlawful course of conduct that, among other things, indirectly manipulated the ABCW stock price and, consequently, induced the Fund, on behalf of its participants, to purchase ABCW securities on Nasdaq, a national exchange, at artificially deflated and inflated prices.

81.    As a result of Hofer's scheme, the Fund participants, and consequently the Fund, relied to their detriment on the artificially deflated and inflated prices in deciding to purchase or sell AUF shares, which resulted in the purchase or sale of ABCW shares by the Trustee.

82.    Had the Fund and its participants known the truth, that the unusually high trading activity was the result of Hofer and the other co-conspirators' Collusive Trading Scheme and not market demand, they would not have purchased or sold at the artificially deflated or inflated prices.

83.    Plaintiff and its participants suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

84. By reason of the foregoing, Hofer directly violated Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder in that he: (1) employed a scheme to defraud; (2) by virtue of the violation of Section 9(a) and the deliberate manipulation of the AUF share, and, consequently the ABCW stock, prices, he made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the Fund and its plan participants in regards to its purchase of securities.

## THIRD CAUSE OF ACTION
## VIOLATION OF WISCONSIN SECURITIES LAW

85. AnchorBank incorporates all preceding paragraphs as if fully set forth herein.

86. By virtue of the foregoing acts, Hofer has committed a violation of Wis. Stat. § 551.501 (1-3)[2], in that Hofer, in connection with the offer, sale, or purchase of a security, directly and indirectly, employed a scheme to defraud the Fund and its participants; and engaged in an act, practice, or course of business that operated as fraud or deceit upon another person.

87. The Collusive Trading Scheme, which involved the collusive purchase and sale of AUF shares within the Fund, constitutes a scheme to defraud the Fund and its participants.

88. Hofer caused the Fund to purchase securities as defined under Wis. Stat. § 551.102(28) and indirectly affected the value of AnchorBank stock.

89. Pursuant to Wis. Stat. § 551.509, the Fund may maintain an action against Hofer for violations of Wis. Stat. § 551.501(1-3).

---

[2] Wisconsin's Uniform Securities Law, previously numbered Wis. Stat. §§ 551.01-551.67, was amended and renumbered to Wis. Stat. §§ 551.101-551.703, effective January 1, 2009.  For the sake of clarity, Plaintiffs refer to the statute's current numbering system.

90.     The Fund and its participants have suffered damages as a result of Hofer's violation of Wis. Stat. § 551.501(1-3).

91.     By virtue of the foregoing acts, Hofer has committed a violation of Wis. Stat. § 551.501(1-3) in that he engaged in an act, practice, and course of business that operated as a fraud and deceit upon the Fund and its participants.

## FOURTH CAUSE OF ACTION
## BREACH OF FIDUCIARY DUTY OWED TO ANCHORBANK

92.     AnchorBank incorporates all preceding paragraphs as if fully set forth herein.

93.     By virtue of Hofer's position as an employee and loan officer/Regional Lending Manager of AnchorBank, he owed AnchorBank certain fiduciary duties, including without limitation, the duties of care, loyalty and good faith.

94.     Hofer, during the course of his employment and as set forth above, engaged in self-dealing transactions in a scheme to defraud the Fund and its participants, all of which are employees of AnchorBank.

95.     In perpetrating the acts as alleged heretofore, including violations of Federal and Wisconsin state securities laws, Hofer breached his fiduciary duty to AnchorBank.

96.     As a result of Hofer's breach of his fiduciary duty, AnchorBank suffered damages and loss.

## FIFTH CAUSE OF ACTION
## UNJUST ENRICHMENT

97.     AnchorBank incorporates all preceding paragraphs as if fully set forth herein.

98.     Hofer received a benefit from his Collusive Trading Scheme in the Fund.

99.     Hofer accepted and retained the monetary benefits as a result of his Collusive Trading Scheme in the Fund.

100.    It would be inequitable to allow Hofer to retain these benefits as a result of his Collusive Trading Scheme.

101.    Due to Hofer's gains as a result of the Collusive Trading Scheme, the Fund and its participants suffered substantial monetary injury.

Plaintiffs demand a trial by jury on all counts.

WHEREFORE, Plaintiffs, prays for judgment as follows:

A.    Judgment entered in favor of the Fund and against Defendant stating that Defendant violated Section 9(a) of the Securities Exchange Act;

B.    Judgment entered in favor of the Fund and against Defendant stating that Defendant violated Section 10(b) of the Securities Exchange Act;

C.    Judgment entered in favor of the Fund and against Defendant stating that Defendant violated Section 551.501(1-3) of the Wisconsin Securities Law;

D.    Judgment entered in favor of AnchorBank and against Defendant stating that Defendant violated his fiduciary duty owed to AnchorBank;

E.    Damages in an amount to be determined at trial;

F.    Punitive damages as a result of Hofer's intentional breach of his fiduciary duties to AnchorBank;

G.    Restitution;

H.    Disgorgement of Hofer's improper gains in the Fund;

I.    Costs, disbursements, attorneys' fees and any other relief this Court deems appropriate.

Dated this 26th day of March, 2010.

         **MICHAEL BEST & FRIEDRICH LLP**


        By:  s/ Monica M. Riederer
          Monica M. Riederer, SBN 1011031
          *mmriederer@michaelbest.com*
          Timothy M. Hansen, SBN 1044430
          *tmhansen@michaelbest.com*
          Melissa H. Burkland, SBN 1071443
          *mhburkland@michaelbest.com*
          100 East Wisconsin Avenue
          Suite 3300
          Milwaukee, WI  53202-4108

          Attorneys for Plaintiffs
          AnchorBank, fsb, and Plumb Trust Company

T:\CLIENTA\012012\0051\A3815320.1