IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ANCHORBANK, FSB, and
PLUMB TRUST COMPANY, on behalf of
all AnchorBank Unitized Fund Participants,

        Plaintiffs,

v.

CLARK HOFER,

        Defendant.

OPINION and ORDER

09-cv-610-slc

---

Plaintiffs AnchorBank, FSB and Plumb Trust Company contend that defendant Clark Hofer manipulated the stock market by orchestrating large trades of units of the AnchorBank Unitized Fund, which led to large trades of stocks for AnchorBanCorp of Wisconsin, Inc. Plaintiffs are asserting federal claims under §§ 9(a) and 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78i(a) and 78j(b)) as well as claims for violation of Wisconsin securities law, breach of fiduciary duty and unjust enrichment. Following dismissal of their first amended complaint for pleading defects, plaintiffs filed a second amended complaint, which defendant also has moved to dismiss.

For the reasons stated below, I am granting defendant's motion to dismiss with respect to the federal claims. I am declining to exercise jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367(c)(3).

Plaintiffs concede that their theory of liability under federal securities law is "novel." That's not entirely their fault: defendant's alleged tactics of using the fund to manipulate the market are unusual.[1] In a nutshell, plaintiffs allege that defendant and two co-schemers unfairly lined their pockets by coordinating a series of burgeoning trades of Fund shares.[2] These shares

---

[1] Defendant reports that he found no cases with similar facts; neither did this court.

[2] The alleged fraud scheme is detailed in the March 5, 2010 order, dkt. 49, at 2-5.

were tied to stocks in the sense that the Fund consisted of AnchorBanCorp stocks and cash, and when the Fund's sales or purchases of funds upset the Fund's cash-to-stock ratio, the Fund would enter the market to buy or sell stock so as to restore the ratio. A more run-of-the-mill case of market manipulation might involve a hypothetical plaintiff who bought or sold stock in the wake of a defendant having bought or sold excessive amounts of stock to manipulate stock values; our hypothetical plaintiff either would buy "too high" or sell "too low" because defendant's transactions had created a price wave that did not represent the true market value of the stock. In the instant case, market manipulation results from excessive sales of stock by the *Fund* (which plaintiffs represent), not by the defendant. The Fund, bound by its mandated cash-to-stock ratio range, was a tool used by defendant and his abettors to manipulate the market.

As explained in the first dismissal order, for plaintiffs to get past first base on their federal claims, their complaint must include: particular facts describing the alleged securities fraud, as required under Fed. R. Civ. P. 9(b); particular facts supporting a "strong inference" of scienter; facts supporting an inference that the alleged fraud caused an economic loss to plaintiffs; and facts supporting an inference that plaintiffs relied to their detriment on the alleged fraud. Dkt. 49, at 5, 7-8. I concluded in the first order that plaintiffs *had* included sufficient facts to satisfy Rule 9(b) and to support a strong inference of scienter, but had *not* alleged enough to satisfy pleading requirements with respect to economic loss ("loss causation") or reliance ("transaction causation").

Plaintiffs now have identified a plausible theory of reliance to accompany the facts of the alleged fraud. According to plaintiffs, the Fund relied on the "integrity" of the Fund trades when agreeing to accept defendant's purchases and sales of Fund shares; at any time, the Fund could

2

have said "no" (and eventually it did), but it did not because it believed that the trades were legitimate.

Where plaintiffs fall short is with their theory of loss causation. First, plaintiffs were unable to generate the factual allegations deemed necessary by this court in its first dismissal order. Plaintiffs were told that they would have to include facts tying the Fund share trades allegedly coordinated by defendant to increased stock trading activity. *Id.* at 10. This required two things: (1) "detail[ing the Fund's] trading on the open market for any given day"; and (2) "describ[ing] whether that trading was related to [the Fund's] obligation to maintain a certain cash balance range." *Id.* Plaintiffs have included allegations about the Fund's daily trading on the open market, but do not identify which of those trades were "forced" by the alleged cash to stock ratio imbalances that defendant caused.

Because plaintiffs' theory is that defendant "induced a disparity" between the stock price and its true value, plaintiffs must allege facts explaining how defendant's acts induced this alleged price disparity. Plaintiffs allege generally that they were "forced" to buy and sell stock on the open market at market prices, but they do not explain when their trades were "forced" and when they were discretionary. This leaves a disconnect between stock price fluctuations and defendant's coordinated Fund share trades. Plaintiffs' allegations suggest that trades by defendant and his alleged co-conspirators comprised a majority of all trades of Fund shares, but this would matter only if the Fund were required to wait until Fund shares were bought or sold by other traders before the Fund could trade on the market. Plaintiffs allege nothing about how much trading the Fund performed independently, but their newly-submitted chart shows the Fund's independence: it would buy or sell stock shares after defendant and the alleged co-conspirators had done the opposite. For example, on June 22, 2009, defendant and alleged co-

3

conspirators first bought about 600,000 Fund shares then sold about the same amount the next day; in the days following that sale, however, the Fund *bought* around 100,000 stock shares each day, three days in a row. Second Am. Cpt., Exh. B, Dkt. 50-3.

Second, the Fund's own role in the scheme prevented it from becoming a victim. As I explained in the previous order, loss causation is nothing more than "the standard rule of tort law that the plaintiff must allege and prove that, but for the defendant's wrongdoing, the plaintiff would not have incurred the harm of which he complains." *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 685 (7th Cir. 1990). The allegations must support an inference that "the defendant's actions had something to do with the drop in value" of the stock. *Ray v. Citigroup Global Markets, Inc.*, 482 F.3d 991, 994-95 (7th Cir. 2007) (citing *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342-43 (2005)).

As plaintiffs see it, the Fund took a hit because defendant and his cohorts bought Fund shares low, which led to increased market activity in the stock (because the Fund, now cash-heavy, would have to re-balance its ratio by purchasing stock); the Fund's stock purchases would raise the stock price; then the trio would sell back to the Fund their recently-purchased Fund shares at the higher price (the Fund being composed of now-inflated stock and cash); this would lead again to increased market activity (because the Fund, now imbalanced in the other direction, would have to sell stock), which would this time lower stock price, leading to another round of buying Fund shares. And so on. This sounds like a good deal for defendant and his alleged co-conspirators, but why is it a bad deal for the Fund? This is where plaintiffs' theory starts to buckle.

The increased market activity would occur as a result of the *Fund's* trading, which means that the Fund would be buying or selling at the non-manipulated price. Only *after* the Fund was

4

forced to make its own purchases would the market price go up. The Fund isn't buying or selling in the wake of a manipulated market because the Fund creates that wake itself (albeit as a result of defendant's actions). The next time defendant is involved, it is in order to take advantage of that manipulation by trading Fund shares, which then forces the Fund to do the same with stocks.

One caveat is that the Fund had the discretion to spread out its "forced" trades over time, meaning it could have put itself in its own wake. However, in that circumstance, two questions arise: did the Fund trade enough before the last round of trades to stimulate the market? If so, why would it wait to trade when facing a loss. knowing its own trades could affect prices in the short term? In all likelihood, the Fund spread out its trades when it had reason to believe it would *not* take a loss, either because its single-day trades were not so large as to affect prices or because other market factors promised better payoff with spread-out trades. Of course, plaintiffs are not required to show that their theory is "likely" (or even more likely than any other possible outcome), but they do need to offer facts to support their theory. In this case, this means the facts must allow an inference that one or more of the Fund's forced trades occurred in the wake of a previous forced trade that affected the market. As explained above, plaintiffs do not identify which of their trades were "forced" (to restore the cash/stock ratio) and which were discretionary, so there is no way to tie any alleged market manipulation with any of the Fund's trades.

Plaintiffs try to reanimate their claim sideways by adding allegations from two Fund participants who allegedly sold Fund shares at depressed values in the wake of defendant's alleged market manipulation. There are two fundamental problems with this: First, the participants' losses result from trading *Fund shares*, not stocks; only purchasers and sellers of federal *securities* can bring § 9(a) or 10(b) claims. 15 U.S.C. § 78i(e); *Blue Chip Stamps v. Manor*

5

*Drug Stores*, 421 U.S. 723, 732 (1975). Because these participants would not have a claim in the first instance, plaintiffs cannot pursue any such claim on their behalf. Second, even if these individuals could bring a claim under a theory that their fund shares were tied to securities, such claims would have to be for their *own* decisions to purchase Fund shares. There is no basis for allowing plaintiffs (on behalf of the Fund) to bring a case for other individuals' decisions to trade. As defendant points out, the one case plaintiffs cite to support such a notion is distinguishable. In *Peoria Union Stock Yards Co. Retirement Plan v. Penn Mutual Life Insurance Co.*, 698 F.2d 320, 326 (7th Cir. 1983), the trustee suing on behalf of plan beneficiaries was investing on those beneficiaries' behalf. In this case, the Fund did no such thing. The Fund simply traded Fund shares with the participants according to the participants' wishes. The Fund cannot pursue claims on behalf of others simply because those participants used the Fund's services.

In conclusion, plaintiffs have failed to fix the pleading deficiencies that were present in their first amended complaint. The allegations underlying their federal securities claims come no closer to supporting any inference that defendant caused the Fund to suffer a loss. Perhaps defendant was engaged in sharp trading practices, but they were not of the sort that are captured by federal securities fraud claim. Plaintiffs have had ample opportunity to craft an acceptable securities complaint but have not been able to do so. Therefore, I will dismiss their federal securities claims with prejudice.

This leaves plaintiffs' state law claims. They must be dismissed as well, but for a different reason. As I mentioned in the previous order, once federal claims are dismissed from a case, as a "general rule," the court should decline to exercise supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(c). *Wright v. Associated Insurance Companies, Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994). None of the usual exceptions to this general rule are present in this case:

there is no indication that any statute of limitations has run on the state law claims, no judicial resources have been committed to the resolution of these claims and it cannot be said that the determination of any of these state law claims is "absolutely clear." *Id.* at 1251-52. Nor is there any other aspect of judicial economy, convenience, fairness or comity to support retaining these claims. *Id.* at 1251 (listing these as the general factors to consider in any case). Perhaps plaintiffs' theory of liability will fit better into one of the state law claims, but that is a matter best left to a state court.

## ORDER

IT IS ORDERED that:

1) Defendant's motion to dismiss (dkt. 52) is GRANTED;

2) Plaintiffs' claims that defendant violated §§ 9(a) and 10(b) of the Securities Exchange Act of 1934 are DISMISSED WITH PREJUDICE for failure to state a claim upon which relief may be granted;

3) Plaintiffs' claims are DISMISSED WITHOUT PREJUDICE under 28 U.S.C. § 1367(c); plaintiffs may refile those claims in state court; and

4) The clerk is directed to enter judgment in defendant's favor and close this case.

Entered this 31st day of August, 2010.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge