IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ANCHORBANK, FSB, and
PLUMB TRUST COMPANY,                                    OPINION AND ORDER
on behalf of all AnchorBank Unitized Fund Participants,
                                                                  09-cv-610-slc
                                    Plaintiffs,

        v.

CLARK HOFER,

                                    Defendant.

Plaintiff AnchorBank, FSB is a federal stock savings association located in Madison, Wisconsin, which offers participants in its § 401(k) plan the ability to purchase units in the AnchorBank Unitized Fund, a fund consisting of AnchorBanCorp stocks and cash. As bank stock prices were cratering in 2008-2009 in the midst of the financial crisis, and investors across America were losing their life savings, defendant Clark Hofer, an AnchorBank employee and participant in the Unitized Fund, saw his § 401(k) plan investments increase from a value of approximately $192,000 to more than $513,000 during the nine-month period from September 2008 to June 29, 2009. Hofer accomplished this feat by frequently buying and selling his Fund shares in ever-increasing amounts, with most of his transactions coinciding with favorable swings in the price of ABCW stock. Hofer's accumulated shares eventually comprised more than 34% of the Fund.

Although the Unitized Fund's rules did not limit how frequently or in what amounts participants could trade, Anchor eventually put a stop to Hofer's frequent, large-scale trading. Then Anchor accused Hofer of intentionally coordinating his trades with two other Anchor employees so as to manipulate the price of ABCW stock. Anchor threatened to sue Hofer and his alleged coconspirators for violating the securities laws if they did not disgorge the profits they

had generated from their Fund transactions between September 2008 and June 29, 2009. Hofer's two alleged coconspirators capitulated and returned the money. Hofer refused.

Anchor made good on its threat and filed this lawsuit, asserting causes of action under federal and state securities laws and breach of fiduciary duty. Hofer has filed counterclaims against Anchor, alleging an interference with his rights under ERISA, 29 U.S.C. § 1001 *et seq.*, and three pendant state law claims: wrongful discharge based on Wis. Stat. § 103.455, extortion and abuse of process.[1]

With respect to the federal securities law claims, Anchor alleges that Hofer violated Rules 9(a) and 10(b)(5) of the Securities Exchange Act of 1934 by engaging in a scheme of indirect market manipulation. The alleged scheme is one of *indirect* market manipulation because Hofer was trading Unitized Fund shares, not securities: the integrity of the stock market is implicated only insofar as the Fund trustee would enter the market in response to Hofer's trades in order to maintain the appropriate ratio of cash to stock in the Fund. This court discussed the novelty of this theory in a previous order granting Hofer's motion to dismiss:

> [P]laintiffs allege that defendant and two co-schemers unfairly lined their pockets by coordinating a series of burgeoning trades of Fund shares. These shares were tied to stocks in the sense that the Fund consisted of AnchorBanCorp stocks and cash, and when the Fund's sales or purchases of funds upset the Fund's cash-to-stock ratio, the Fund would enter the market to buy or sell stock so as to restore the ratio. A more run-of-the-mill case of market manipulation might involve a hypothetical plaintiff who bought or sold stock in the wake of a defendant having bought or sold excessive amounts of stock to manipulate stock values; our hypothetical plaintiff would either buy "too high" or sell "too low" because defendant's transactions had created a price wave that did not represent the true market value of the stock. In the instant

---

[1] Hofer also asserted but then withdrew a claim for wrongful discharge under Wis. Stat. § 943.30.

> case, market manipulation results from excessive sales of stock by the *Fund* (which plaintiffs represent), not by the defendant. The Fund, bound by its mandated cash-to-stock ratio range, was a tool used by defendant and his abettors to manipulate the market.

Op. and Order, Aug. 31, 2010, dkt. 60, at 1-2. *See also* Op. and Order, Nov. 23, 2010, dkt. 78, at 6 ("Defendant's alleged market manipulation would be a textbook case of a violation of §§9(a) and 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78i(a) and 78j(b)) if it weren't for the fact that he used another entity to buy and sell the stock for him.")

The foundations of plaintiffs' theory have been weak from the outset. *See* Op. and Orders, March 5, 2010, dkt. 49, and Aug. 31, 2010, dkt. 60. Although I concluded that plaintiffs' federal securities claims failed at the pleading stage for their failure to allege facts from which it could be inferred that Hofer's alleged collusive trading had artificially inflated or deflated the price at which AnchorBank stock was traded on the open market, the Court of Appeals was satisfied that plaintiffs' complaint had met the necessary pleading requirements, so it reversed this court's dismissal order and remanded the case for further proceedings. *Anchorbank, FSB v. Hofer*, 649 F.3d 610 (7th Cir. 2011).

Now Hofer has moved for partial summary judgment on the federal securities fraud claims, dkt. 123, and plaintiffs have moved for summary judgment on all of Hofer's counterclaims. Dkt. 118. Also pending is Hofer's motion to strike plaintiffs' response to his summary judgment motion on the ground that plaintiffs have advanced a new "dilution" theory of harm not alleged in their second amended complaint. Dkt. 174.

The issue raised in Hofer's motion to strike is dispositive. As is plain from plaintiffs' response to the summary judgment motion, their original market manipulation theory has not panned out. Although plaintiffs' expert was able to identify five dates on which the trading in

the Fund by Hofer and his alleged cohorts affected the price of Anchor stock on the open market, plaintiffs have not adduced any actual evidence to support their allegation that the trustee was "forced" to trade on those days in order to restore the cash/stock ratio. In fact, they have not shown that the trustee was obliged to maintain any specific ratio of cash in the Fund for most of the time period in question. Neither is there any evidence in the record that the Fund or any individual participants purchased or sold Fund shares on those five dates in reliance on the market price of AnchorBank stock. Further, although plaintiffs claim that Hofer's collusive trades in the Fund on those dates caused an under- or over-valuation of ABCW stock, they make no attempt to quantify the difference between the price at which the trustee bought or sold stock shares and the "true" value of the stock. All told, at this "put-up-or-shut-up" juncture in their lawsuit, plaintiffs' market manipulation theory seems to have been essentially an unsupported bluff.

Indeed, plaintiffs appear to have all but abandoned their market manipulation theory in favor of a new one, which accuses Hofer *not* of artificially affecting the price of AnchorBank stock, but of "diluting" the value of the Unitized *Fund shares* of the "buy and hold" investors in the Fund. But this dilution resulted in large part from the structure of the Fund, which guaranteed same-day payment for trades based on the price of Fund shares at the end of the day, and which had no rules limiting the frequency and amount of trading in the Fund. This set-up allowed savvy–or lucky–market-timers like Hofer and his alleged cohorts to gain an ever-increasing share of the equity in the Fund to the detriment of non-trading Fund participants. This may have been a sharp practice by Hofer and the others, but Hofer's activities did not cause

a loss for which the federal securities laws afford recovery. Accordingly, Hofer's motion for summary judgment will be granted.

As for plaintiffs' motion on Hofer's counterclaims, I am granting the motion with respect to the claims of extortion and abuse of process, but denying it as to his other claims. Hofer has adduced sufficient evidence from which a reasonable jury could find that Anchor did not reasonably believe that Hofer actually had violated the securities laws. This puts into question Anchor's motives and intent regarding what it said and did to Hofer, which suffices to warrant a trial on Hofer's claims for interference with his ERISA rights. Hofer also is entitled to a trial on his claim that Anchor discharged him in violation of the public policy embodied in Wis. Stat. § 103.455. Hofer's extortion claim must be dismissed because a private citizen cannot bring a civil claim of extortion pursuant to § 943.30, a criminal statute. His abuse of process claims also must be dismissed because Hofer has failed to meet his burden of showing that plaintiffs filed this suit for a purpose other than to obtain relief for their claimed injuries. Unsupported as those claims may be, this is insufficient to warrant a trial on the abuse of process claims.

From the proposed findings of fact submitted by the parties, I find the following facts to be material and undisputed for the purpose of deciding the motions for summary judgment:

## FACTS

### I.  The Parties

Plaintiff AnchorBank, fsb ("Anchor") is a federal stock savings association located in Madison, Wisconsin. Plaintiff Plumb Trust Company is an independent Wisconsin state-

chartered trust company. Plumb is an appointed trustee of the AnchorBank Unitized Fund, an investment option within AnchorBank's 401(k) retirement plan.[2]

Clark Hofer was employed as an at-will employee of Anchor beginning in 1984. From December 2006 until his resignation in October 2010, he had the position of Vice President-Regional Lending Manager. As Regional Lending Manager, his principal responsibilities were to manage, supervise and train mortgage loan officers and related employees.

## II. AnchorBank's Unitized Fund

Anchor provides its employees with the option to defer a portion of their compensation into a § 401(k) account in Anchor's retirement plan, and provides additional compensation to employees in the form of matching payroll contributions derived by formula. Anchor's § 401(k) plan offers participants various options for investing their contributions. One of these options is the AnchorBank Unitized Fund, a unitized stock fund that Anchor offers to its employees as a component of its § 401(k) plan. The Unitized Fund is comprised of cash and the company stock of Anchor BanCorp of Wisconsin (ABCW), the holding company of plaintiff AnchorBank. Participants investing in Fund shares are investing in both the stock and cash portions of the Fund. Thus, participants who invest in the Fund hold units in the Fund, they do not hold

---

[2] Hofer makes the puzzling argument that only the trustee of the *entire* Retirement Plan, in this case the Charles Schwab Trust Company, has standing to pursue on behalf of the Fund participants. He appears to be relying on the court's statement in *Peoria Union Stock Yards Co. Retirement Plan v. Penn Mut. Life Ins. Co.*, 698 F.2d 320, 326 (7th Cir. 1983), that "[t]he assets of the plan are of course held in trust . . . but the trustee is the proper party to sue on behalf of the trust." But nothing in the court's statement (or anything else in the opinion) suggests that a co-trustee whose authority is limited to a certain fund in a retirement plan cannot sue on behalf of the participants in that fund. Read in proper context, all the court was saying in *Peoria Union* is that although the retirement plan in that case did not have standing to sue under the securities laws, the trustee of the plan's assets did have such standing. Here, Plumb is a trustee of the assets in the Unitized Fund and may sue on behalf of Fund participants.

shares of ABCW stock.  ABCW stock is traded on NASDAQ.  The Fund is managed by one of the Fund's directed trustees.

Participants in the Anchor retirement plan are entitled to direct the trustee to invest amounts in their account in accordance with the rules established by the plan administrator. Participants can do this using Anchor's intranet site, www.plandestination.com.  Participants can reallocate their funds in the § 401(k) account among a number of different investment options, one of which is the Unitized Fund.  During the relevant time period, from September 2008 to late June 2009, Anchor did not limit the amount of money that plan participants could move into or out of the Fund, nor did it limit the number of days on which a participant could make changes to the distribution of funds in his §401(k) account.[3]  In other words, there were no limits on the frequency or amount of trades: plan participants could move funds in and out of the various investment options on a daily basis, in whatever amounts they wished.

When plan participants buy or sell Fund shares (by moving funds into or out of the Fund, respectively), the Fund's trustee settles those purchases and sales each night.  The § 401(k) account of a Fund participant is credited with the closing price of a Fund share[4] on any day the participant buys or sells in the Fund prior to 3 p.m., Central Standard Time.  This credit is made regardless whether the trustee buys or sells ABCW stock on the Stock Exchange in response to the participant's trade and, in the event the trustee *does* later buy or sell, regardless of the price obtained by the trustee on the Exchange.  Typically, the Fund is able to settle the

---

[3] Perhaps not surprisingly, soon after the events at issue in this lawsuit, Anchor established rules for the Fund that limited trading frequency and volume.

[4] The parties dispute whether the closing price with which a participant is credited at the end of the day is the price of a Fund share or the price of ABCW stock, but this dispute is not material.

purchases and sales by using its cash holdings in the Fund. The earliest that the trustee trades on NASDAQ in response to trades made by a Fund participant is the day after the day the participant trades. Sometimes, however, the trustee waits a few days after a participant trade before it trades on the market; sometimes the trustee does not enter the market at all.

State Street Bank was the Plan's trustee during all but the last six weeks of Hofer's alleged scheme, having served in this role from 2001 until May 18, 2009. During State Street Bank's tenure as trustee, it delegated the role of managing the day-to-day cash and stock balance of the Fund to Wisconsin Capital Management, a licensed investment advisory entity. Tom Plumb is the President and CEO of Wisconsin Capital Management. He also is the President of the Plumb Trust Company, which is a separate and affiliated entity with Wisconsin Capital Management. Plumb was instructed by Anchor's investment committee to keep the performance of the Fund as close as possible to the performance of ABCW stock.

During the period when State Street Bank was trustee, each day after the close of trading State Street Bank would provide a statement to Wisconsin Capital Management that showed the trades made that day by participants in the Fund. Tom Plumb would analyze these statements and determine whether the Fund's cash-to-stock ratio needed to be rebalanced. Plumb testified that he "typically retained a cash balance of $75,000 to $100,000," in order to provide liquidity for the modest amount of daily trading activity in the Fund without having so much cash as to cause Fund performance to diverge significantly from ABCW stock performance. Dec. of Tom Plumb, dkt. 153, ¶ 7. This cash balance was approximately 1% to 3% of the Fund's total value. When the cash balance of the Fund got too high, Plumb would purchase ABCW shares in order to re-balance the Fund, and likewise would sell when he decided that greater

liquidity was needed. However, plaintiffs do not have any documents showing what the cash-to-stock ratio was on any day that Plumb traded, and they do not have any documents showing that Anchor required Plumb to maintain a specific ratio.

Anchor provided its employees with information about the Fund in a document titled "Answers to commonly asked questions about the Anchor Stock Fund in the 401(k) Retirement Plan." This document contained the following information:

- a portion of the Fund consisted of cash;

- it normally took three business days for sales of stock to settle;

- this cash buffer was necessary so that the trustee could settle participant transfers out of the Fund on the day the transfer was made, without waiting for the sale of stock to settle;

- the percentage of cash in the Fund was usually between 1% and 3% of the account's total assets;

- a unit in the Fund was a portion of ownership in the fund that consisted of a combination of cash and shares; and

- The price of a Fund unit is not the same as the price of a common share of stock, but it generally moves in the same direction as the value of pure stock.

Anchor mailed this Q&A document to all plan participants, including Hofer, in 1999 as an insert to the mailing of quarterly participant statements and posted it on Anchor's intranet site, www.plandestination.com, since 2007. (An amended version of the Q&A was posted on the plan's website on June 24, 2009). However, Hofer denies having seen the Q&A until it was sent to him as an attachment to an email from one of his alleged co-conspirators on March 2, 2009.

The Q&A is the only document made available by Anchor or the trustee to employees regarding the cash to stock ratio and mechanics of the Fund.[5]  Anchor did not provide participants with detailed information about the management of the Fund by the trustee, such as the number of trading days available to the trustee, the days on which the trustee trades or whether the trustee trades at all in response to a trade of a participant.  Participants making a trade had no way to know who else in the Fund might have traded that day and did not know whether trades by other Fund participants could be "offset" against another.  However, Fund participants could log onto the intranet site and view updated daily information about the Fund, including the total number of shares and price per share.[6]

## III.  Fund Activity from September 2008 to June 2009

During the latter part of 2008 and continuing to April 2009, Plumb began noticing that the Fund was experiencing large cash influxes and outflows on a regular basis; these trades were larger than any trades he had seen since he began managing the Fund.  To maintain the aimed-

---

[5]  Plaintiffs point to the following documents or information as evidence to support their contention that Hofer and his alleged cohorts knew enough about the Fund to have concocted their market manipulation scheme:  1) a Power Point presentation in October 2008 showing that the Fund contained 588,728.23 shares valued at $7.24 per share; 2) an October 2008 Summary Annual Report for the AnchorBank Retirement Plan that identified the total number of participants in the plan; and 3) a roster of AnchorBank employees.  According to plaintiffs, this information was sufficient to have allowed the employees to estimate the "size of the Fund in both number of shares and value."  Dkt. 146, at 9-10.  Putting aside the fact that the last two documents provide no information about the number of participants in the *Fund*, plaintiffs do not explain how Hofer and company could have created the alleged complex scheme of market manipulation simply by knowing the number of shares in the Fund and its total value.

[6] Fund participants also might have been able to view the total value of the Unitized Fund on www.plandestination.com.  Anchor's witnesses offered contradictory testimony on this point. *Compare* Dec. of Dawn McPeak, dkt. 149, ¶13 (stating Fund participants could view total value of Fund on website) *with* Deposition of Ron Osterholz, dkt.133, at 117 (stating they could not).

for balance of cash and stock in the Fund in the face of these large inflows and outflows, Plumb would either buy or sell ABCW stock. Prior to March 2009, Plumb was able to keep the cash portion of the Fund within the guidelines for the cash-to-stock ratio.[7]

During this time period, both the price of ABCW stock and the value of Fund units were declining. In March 2009, the price of a Fund unit share dropped more than the price of ABCW stock. Sometime that month, Plumb notified Anchor that there was "heightened activity" in the Fund and that the cash percentage was out of balance.

Plumb was not the only person who was concerned about the drop in the price in Fund shares: on March 2, 2009 a Fund participant, Stephen Kundert, emailed Dawn McPeak in the Human Resources Department, asking about the change in value of his cash in the Fund. On March 12, 2009, Employee B (one of the alleged co-conspirators), emailed McPeak, indicating that there must be a "mistake" on the posted price of a Fund share, because on a day when the ABCW stock price dropped from $.49 to $.48, the Fund price dropped from $.73 to $.07. McPeak responded that the numbers were correct. Around that same time, Hofer contacted the plan administrator to ask about what he thought was an "input error" in his account; the administrator responded, asking for more detail.

In April 2009, Anchor retained Charles Schwab Trust Company to act as the trustee for the AnchorBank Retirement Plan, replacing State Street Bank. Schwab became trustee effective

---

[7] This fact was provided by Ron Osterholz, Anchor's Senior Vice President of Human Resources. Deposition of Ron Osterholz, dkt.133, at 55-56. Contrary to plaintiffs' Response to Hofer's Proposed Finding of Fact on this issue, dkt. 170, ¶¶ 54-55, neither Plumb's general assertion that it became "more difficult" to manage the cash and stock ratio in the Fund on a daily basis during this time period nor their expert's report contradicts Osterholz's testimony that the Fund was not out of balance before March 2009.

the week of May 18, 2009. The Sponsor Agreement between Anchor and Schwab provided that Schwab would monitor the liquidity, or cash portion, of the Fund on a daily basis, and would not buy or sell stock if the liquidity was within the specified range unless Anchor directed it to do so. Anchor requested that Schwab maintain a cash balance in the fund of 5-20% of the account's total assets, with a Liquidity Target Range of 5-20%. In spite of this request, Schwab did not implement these ratios until September 24, 2009; instead, it used a cash-to-stock ratio of 5-11%, with a target of 8%. Anchor did not inform plan participants of these ratios or targets.

In June 2009, at least four participants again raised questions with Anchor about the drop in the price of Fund units. On June 25, 2009, a participant spoke to and emailed Christopher Boyce, Anchor's Chief Investment Officer, asking about the drop in Fund value relative to ABCW stock price. In response, Boyce began to investigate the transaction history in the Fund to try to understand what was happening.

Anchor's review of the Fund transaction history showed that from September 2008 to June 2009, the majority of the trades made had been by three individuals (Hofer, Employee A and Employee B) who had traded frequently on the same day or within one day of each other. Between September 2008 and June 29, 2009, there were 38 occasions in which Hofer traded shares in the Fund either on the same day or within one day of one or both of these employees. In each of those 38 cases, the combined trades were the large majority of the total shares of the Fund traded. On 21 of the 38 occasions, the trades by Hofer and/or the other two employees comprised 100 % of the total Fund share volume; on the other 17 of the occasions, these trades comprised between 90 and 99% of Fund share volume.

In addition, the volume of sales and purchases by Hofer, A and B had increased over time from September 2008 to June 2009. For example, on September 3, 2008, total trading volume of the group was 12,997 shares (sold). By March 18, 2009, the total trading volume was 189,018 shares (sold) and the next day trading volume was 237,176 shares (bought). The volume increased even more after this point: on May 12, 2009, total trading volume of the group was 376,655 shares (sold) and on June 22, 2009, total trading volume of the group was 666,388 shares. On June 29, 2009, Hofer and the others purchased a combined total of 1,943,984 Fund shares.

Finally, a review of the employees' Fund history showed that, while the value of Fund shares plummeted, the trio's Fund balances showed significant gains. Hofer had a first quarter 2009 gain of 32.2% and a second quarter gain of 99.6%; Employee B had a first quarter gain of 40.7 and a second quarter gain of 96%; and Employee A enjoyed a second quarter return rate of 89.2%. By June 2009, Hofer had accumulated nearly 1 million Fund shares, representing 34% of the Fund shares outstanding.

Anchor discovered during its investigation that, prior to or contemporaneously with many of these transactions, Hofer had communicated in person with A and by phone or email with B. The emails between Hofer and B included the following:

- December 28, 2008: Employee B emails Hofer to let him know he went "70% back in and kept 30% cash hoping it goes lower"; to which Hofer responds "I'm all in";

- Feb. 5, 2009: Employee B emails Hofer to let him know he got "½ out";

- Feb. 10, 2009: Hofer emails Employee B asking "back in?" to which B responds, "I didn't do anything";

- March 23, 2009: Hofer sends Employee B an email stating "25 %;"

- March 26, 2009: Hofer emails Employee B stating "all out," to which B responds "[a]ll out, I pushed the envelope another 94 seconds than you did";

- April 16, 2009: Employee B emails Hofer to ask if Hofer is able to obtain "real time quotes this a.m."; Hofer responds: "No, there [*sic*] system must be down."

Some of the emails were sent after the close of the day's trading and included a copy of the email sent by the Plandestination administrator, confirming that the employee had traded Fund shares that day. Anchor also discovered that Hofer and Employee B were frequently accessing finance and market-watching websites on a daily basis, sometimes up to 50-90 times a day.

## IV. Anchor's Response to the Employees' Trading Activity

Anchor intervened after the trade tsunami on June 29, 2009. On July 2, 2009, Hofer, Employee A and Employee B were summoned to a meeting with several Anchor high-level officers and representatives, including Boyce and Ron Osterholz. At the meeting, Anchor accused the three men of coordinating trades in order to manipulate the price of ABCW stock. All three denied the accusation. When asked individually to describe their trading philosophy, each employee said essentially the same thing: that they were trying to increase their number of shares of Anchor stock by watching for fluctuations in the price of ABCW stock and "buying low and selling high," based on their belief that ABCW stock would eventually rebound. Although Employees A and B each acknowledged having had discussions with Hofer about trading activity and strategy, they denied that they had agreed or planned to coordinate trades or attempt to manipulate stock price.

On July 30, 2009, Osterholz sent Hofer a Memorandum informing him that Anchor had determined from its investigation that Hofer had been involved in a scheme "deliberately designed to manipulate the price of AnchorBank stock." Anchor said it had determined "conclusively" that Hofer's conduct constituted market manipulation in violation of the federal securities laws and that it was confident it would prevail if it were to file a lawsuit against him. In the memorandum, Anchor offered to release Hofer of all claims if he would disgorge the profits he had made in his 401(k) account from the alleged scheme, a sum that Anchor had calculated to be $418,262.35. Anchor's offer was also conditioned upon Hofer acknowledging that his employment at Anchor would be terminated and releasing Anchor from any legal or administrative action arising from that termination. Hofer refused to disgorge the profits, and was placed on unpaid suspension on August 1, 2009.[8]

On July 2, 2009, Anchor cut off Hofer's ability to access the Plan Destination website and told him that he could only make small trades in his 401(k) if he did so through Dawn McPeak, Anchor's Human Resources Director. By the fall of 2009, Anchor eased its restrictions on the amount of trading by Hofer that it would allow, permitting him to trade once a week and no more than 20% of his Fund holdings on any single trade. (By that time, Anchor had imposed these same limitations on all Fund participants.) Hofer still was subject to the requirement that he make all trades through McPeak and he was denied access to Plan Destination.

Hofer began searching for employment after Anchor suspended him and made clear that it would not reinstate him to his position. On or about September 8, 2009, Monona State

---

[8] Employees A and B agreed to disgorge their profits; both still are employed at Anchor.

Bank, one of Anchor's competitors, offered Hofer a job as a residential loan officer. Hofer accepted the offer and began working there on or about September 8, 2009.

## V. The Non-Compete Agreement

Hofer had signed a confidentiality and non-solicitation agreement with AnchorBank on December 20, 2006. Anchor requires certain categories of employees to sign these agreements and believes such agreements to be necessary to protect its business, customer relationships, goodwill, confidential information and trade secrets.

The Agreement that Hofer signed stated, in part, that "Employee acknowledges that the Company is engaged in a highly competitive industry which draws customers primarily from the local communities both in and surrounding the locations of its corporate and branch offices throughout the State of Wisconsin . . .". The Agreement prohibited Hofer, during his employment and for a period of one year after the termination of his employment, from attempting to divert AnchorBank business, either directly or indirectly, from (a) any person or customer for whom Hofer had performed personal services within the last year of his employment; or (b) any person who Hofer knew had been identified as a prospective customer of AnchorBank within the last six months of Hofer's employment. Agreement, attached to Osterholz Dec., dkt.121, exh. B at ¶¶ 3.1, 3.2.

On October 1, 2009, McPeak received an email from Hofer. The e-signature on the email identified Hofer as a Mortgage Originator for Monona State Bank, one of Anchor's competitors. McPeak provided the email to Osterholz.

On October 5, 2009, Anchor filed its original complaint against Hofer, alleging causes of action for violations of Rules 9(a) and 10(b) of the Securities Exchange Act and the Wisconsin securities laws, breach of the non-solicitation agreement and breach of fiduciary duty. With respect to the non-solicitation agreement, Anchor alleged that the agreement prohibited Hofer from diverting Anchor's "current or potential business by providing the same or similar services as Anchor;" that Hofer was violating his duty "not to compete" and the non-solicitation agreement by working for Monona State Bank; and that the agreement prohibited Hofer from soliciting individuals or companies that had been Anchor customers within the year preceding Hofer's employment. Dkt. 1, ¶¶ 8, 51, 52. At paragraph 8 of the complaint, Anchor incorporated the entire non-solicitation agreement into the complaint by reference, attaching a copy as Exhibit A to the complaint. *Id*. at ¶8.

At his deposition, Osterholz offered the following explanation why Anchor included the breach of the non-compete agreement claim in its complaint:

> Q:    And you have no idea at the time that you filed the complaint against Mr. Hofer whether or not he was soliciting any of Anchor's customers, isn't that right?
>
> A:    I think it was a legal strategy to have that in there, given he was suspended and he was working for a competitor. I mean, to me that doesn't seem to be okay. We hadn't terminated him, he hadn't resigned and he goes to work for a competitor. I don't understand why that's an issue. I mean, you're telling me it is, but that's why it's there.

Dep. of Ron Osterholz, dkt. , at 208-209.

The day after the complaint was filed, the local newspaper published an article about the lawsuit, in which it referred to Anchor's allegations that Hofer had taken a job with Monona

State Bank and that by doing so, he had breached a non-solicitation agreement with Anchor. Monona State Bank subsequently terminated Hofer.

On October 26, 2009, Hofer filed a motion to dismiss. Anchor and the Fund filed an amended complaint, in which they eliminated the claim for breach of the non-compete agreement. Dkt. 19.

Hofer applied for unemployment compensation after Monona State Bank terminated his employment. In a document provided to the Wisconsin Unemployment Division regarding the reasons for Hofer's disciplinary suspension, McPeak stated, among other things, that Hofer had taken advantage of a "loop hole," noting that Anchor "did not put a limit to the number of stocks that could be traded in the 401k program." UI Claim Investigation–Employer Statement, attached to Aff. of Lawrence Bensky, dkt. 165, Exh. D.

## VI. Plaintiffs' Market Manipulation Theory

In their amended complaint, plaintiffs accused Hofer of engaging in

> a collusive strategy of buying and selling [AnchorBank Unitized Fund] shares within the fund which directly affected the [Anchor BanCorp of Wisconsin] stock price ("Collusive Trading Scheme") and which eventually resulted in large gains to those co-conspirators and losses to the Fund and the other Fund participants. . . . Hofer . . . was the mastermind or leader of the group.
>
> Dkt. 19 at 4 (¶¶ 18 & 19).

Plaintiffs alleged that the intermediary between Hofer's trading of Fund units—which was done within the Fund—and the price of ABCW stock on the open market was the Fund trustee, and that Hofer and his cohorts intentionally manipulated the trustee's activity on the stock market

by exploiting the Fund's cash-to-stock ratio. Specifically, plaintiffs alleged that the Fund was required to maintain a certain ratio of cash to stock, which during the relevant time period was 5-11% with a target of 8%, *id.*, at ¶11; that Fund participants, including Hofer, were notified of the Fund's cash/stock ratio requirements, ¶12; and that when the cash-to-stock ratio became imbalanced, the Fund was "required" to enter the market to buy or sell stock to restore the ratio, ¶¶13-17. According to plaintiffs, the Collusive Trading Scheme allegedly worked as follows:

> For the first step, Hofer and at least one of the co-conspirators would coordinate their sale of Fund units. This triggered a payout from the Fund's cash reserves to the co-conspirators. Because the trustee was required to maintain its cash-to-stock ratio of 5–to–11%, it was forced to sell AnchorBank stock on the open market, at market prices, to replenish the Fund's cash reserves. This heightened activity as a result of the collusive trading by the co-conspirators caused the volume of AnchorBank stock on the market to be relatively high as compared to the average daily trading volume of AnchorBank stock, and, given the large volume of AnchorBank stock being sold at or around the same time, the AnchorBank stock price declined. The second step of the alleged scheme involved a coordinated purchase of Fund units by Hofer and at least one of the co-conspirators, which again upset the balance of the Fund's cash-to-stock ratio. Seeking to maintain the ratio as it was required to do, the trustee bought AnchorBank shares on the open market, and, given the large volume of stock being purchased at or around the same time, the AnchorBank stock price increased. After the AnchorBank stock price was artificially inflated because of the collusive trading activity, the co-conspirators would again conduct a coordinated sale of Fund units, repeating the illicit cycle.

*AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615-16 (7th Cir. 2011); Am. Compl. at ¶¶ 20-25. Plaintiffs further alleged that other Fund participants had relied on the "artificially high or low prices" of AnchorBank stock in making decisions whether to purchase or sell Fund units. Am. Compl. at ¶55.

This court granted Hofer's motion to dismiss the amended complaint, finding that plaintiffs had failed to allege sufficient facts to reasonably support an inference of two elements necessary to their securities fraud claims: loss causation and reliance. Op. and Order, March 5, 2010, dkt. 49. With respect to loss causation, I found that although the exhibits to the amended complaint showed that there had been increased trading by the Fund manager on the market on days after coordinated trades occurred, plaintiffs had not explained how the amounts traded related to the Fund's required cash balance requirements or how much of the increased trading volume was caused by the Fund manager, which made it unreasonable to infer that Hofer was to blame for the increased market activity that occurred after the coordinated trades. *Id.*, at 10. With respect to reliance, I found that the Fund's allegation that it was *required* to purchase or sell its stock on the market when it came outside the acceptable cash balance range undermined any inference that the Fund had traded in reliance on the integrity of the market when making its trade decisions. *Id*. at 10-11. As for plaintiffs' general allegation that "other Fund investors" might have relied on the market price, I noted that plaintiffs would need to identify one or more particular Fund participants (other than Hofer or A or B) who bought or sold Fund shares during those periods of time in which the coordinated transactions appear to have swayed the market. *Id*. at 11-12.

Plaintiffs were given one last opportunity to amend their complaint to attempt to cure these deficiencies. With respect to loss causation, plaintiffs were told that they would have to include facts tying the Fund share trades allegedly coordinated by Hofer to increased stock trading activity, namely, by (1) detailing the Fund's trading on the open market for any given

day; and (2) describing whether that trading was related to the Fund's obligation to maintain a certain cash balance range. *Id*. at 10.

Anchor filed a Second Amended Complaint on March 26, 2010, joined by the Plumb Trust Company as a plaintiff in place of the Fund. Dkt. 50. Plaintiffs added a number of allegations regarding how the trustee traded ABCW stock in response to Fund trades, explaining that when Fund participants traded Fund shares in amounts great enough to move the stock/cash ratio outside the target range, the trustee would be required to trade stock on the open market in order to restore the ratio. In doing so, plaintiffs alleged, the trustee had discretion to decide when and in what amounts to trade ABCW stock on the open market, where within the acceptable range to maintain the ratio and could even delay or refuse to make trades if the circumstances warranted. Sec. Am. Compl. at ¶¶14-19. Anchor and Plumb also added, among other things, a paragraph describing examples of trading activity by Fund participants "M" and "H", stating that both M and H sold their Fund shares "at a lower price as a direct result of the Collusive Trading Activity by Hofer and the other co-conspirators." Second Am. Compl. at ¶66.

Hofer again moved to dismiss. I found that plaintiffs' new complaint sufficiently alleged reliance but still fell short with respect to loss causation because plaintiff had failed to allege facts permitting an inference that defendant's actions "induced a disparity" between the stock price and its true value. Opinion and Order, Aug. 31, 2010, dkt. 60, at 3. Specifically, although plaintiffs had alleged generally that the trustee was "forced" to trade in response to the co-conspirators' large trades of Fund shares, it had not explained when its trades were forced and when they were discretionary, leaving a disconnect between stock price fluctuations and Hofer's coordinated Fund share trades. *Id*. In addition, I found that the Fund's own role in the scheme

prevented it from being a victim because, according to plaintiffs' theory, it was only after the *Fund* traded that stock prices would go up or down.  The Fund would therefore suffer a loss from Hofer's alleged scheme only if the facts could support an inference that "one or more of the Fund's forced trades occurred in the wake of a previous forced trade that affected the market." *Id*. at 5.  Finally, I found that the allegations regarding participants H and M did not advance plaintiffs' claim for two reasons: 1) H and M were trading Fund shares, not securities, so they lacked standing; and 2) even if these individuals' claims could be tied to securities, only M and H had standing to assert them; the Fund could not bring them on their behalf.  *Id*. at 6.

As noted above, the Court of Appeals reversed, finding that plaintiffs had alleged sufficient facts in their complaint to meet the applicable pleading standards.  *AnchorBank,*, 649 F.3d at 618.  With respect to M and H, the court agreed that plaintiffs could not maintain claims on behalf of these individuals, but found it was "not improper for the plaintiffs-appellants to file suit on behalf of all Fund participants, and use M and H as examples of the effect of Hofer's alleged activities on the Fund."  *Id*. at n. 2.  With respect to loss causation, the court wrote:

> It is true, as the district court noted in dismissing the plaintiffs-appellants' complaint, that the trustee had some discretion on how to space out its purchase and sale of AnchorBank stock to maintain the Fund's requisite cash-to-stock ratio.  And it is true, as Hofer notes on appeal, that the dramatic decrease in the value of AnchorBank stock could have been influenced by the general economic downturn that impacted the financial services industry.  However, we do not require that a plaintiff plead that all of its loss is necessarily attributed to the actions of the defendant, only that it plead that the defendant is at least one plausible cause of the economic loss.  *Caremark, Inc.*, 113 F.3d at 649 ("[I]t is possible for more than one cause to affect the price of a security and, should the case survive to that point, a trier of fact can determine the damages attributable to the

fraudulent conduct."); *see also Ray v. Citigroup Global Markets, Inc.*, 482 F.3d 991, 994–95 (7th Cir. 2007) (analyzing loss causation requirement and noting that a plaintiff must be able to plead and prove that "the defendant's actions had something to do with the drop in value" of the stock).

*Id*. at 618.

## VII. Plaintiffs' Expert Report

In opposition to Hofer's pending summary judgment motion, plaintiffs submitted an expert report prepared by Edward S. O'Neal, who was retained by plaintiffs to provide an opinion regarding the damages caused to the Fund by the employees' alleged scheme. Expert Report of Edward S. O'Neal, dkt. 167. O'Neal performed what is known as an "event study" for 50 trading days between September 17, 2008 and June 29, 2009 in which he concluded the Unitized Fund had traded "in response to trades from the alleged co-conspirators." (As discussed below, O'Neal's testimony that the Fund trustee traded "in response" to trades from the alleged co-conspirators was not based on any analysis of the cash/stock ratio at the time the trustee traded or whether the trustee was required to trade to bring the ratio within the specified range; O'Neal testified that he was never asked to consider those questions. Dep. of Edward S. O'Neal, dkt. 134, at 182, lines 3-12.) O'Neal's analysis revealed that, of those 50 days, there were five in 2009 on which the employees' trades affected the price of ABCW stock on the open market.[9] However, O'Neal's report did not identify or quantify any loss to the Fund or to any single participant who bought or sold Fund shares on those five days in reliance on the market price of ABCW stock. In fact, neither H nor M, the two individual participants identified in the

---

[9] Those days were March 26, April 8, April 16, May 12 and June 22.

Second Amended Complaint, traded Fund shares on any of the five days identified in O'Neal's study.

The only loss that O'Neal quantified was that sustained by the non-trading, buy-and-hold participants in the fund, whose holdings were diluted as a result of the employees' trading. According to O'Neal,

> The combination of the large in-and-out collusive trading and the movements in the price of ABCW stock around the collusive trades in the AUF diluted the buy-and-hold AUF shareholders. This dilution occurred as the co-conspirators avoided the negative effects of ABCW stock price declines by selling AUF shares prior to the declines. Dilution also occurred as the co-conspirators made large purchases of AUF shares prior to increases in the price of ABCW stock.

> Expert Report of Edward S. O'Neal, dkt. 167, ¶9.

As he put it at his deposition, "[d]ilution occurs when you buy strategically ahead of an anticipated gain or loss and you get – for lack of a better term, you get it right." Dep. of Edward S. O'Neal, dkt. 134, at p. 36, lines 17-20. O'Neal compared the effects of the employees' trading to the dilution effects in the mutual fund market-timing scandal of the early 2000s, where market-timers would move into funds ahead of predictable price increases and would sell ahead of predictable price decreases. O'Neal Report, dkt. 167, at ¶12.

O'Neal explained that this dilution occurs because the Unitized Fund has a leveraged position in the stock prior to a stock price decline and a short position in the stock prior to stock increases. This hypothetical example, taken directly from O'Neal's report, illustrates how dilution occurs when employees make large sales of shares prior to a price decline:

> Hypothetically, assume that there are 1 million AUF shares outstanding and that 200,000 of those shares are owned by the co-conspirators. Also assume that the fund holds as its assets 1

million shares of ABCW stock and that the stock price is $1. Further assume that the price per AUF share of the fund is also $1. Now assume that the co-conspirators sell all of their AUF shares, leaving 800,000 AUF shares being held by buy-and-hold AUF shareholders. The assets of the AUF are now the 1 million shares of stock and a cash position of -$200,000 (the fund had to borrow the $200,000 to pay the co-conspirators, but has not sold any of the shares of stock). This position is equivalent to a leveraged position in the stock. Now, assume the stock price subsequently falls to $0.80 per share. The assets of the fund are now $800,000 in stock and a -$200,000 cash position. Total assets in the fund are $600,000. The fund price is thus $600,000/800,000 shares outstanding = $0.75. Note that had the co-conspirators not sold their shares in the fund, the AUF share price would simply have been $0.80 (the only assets in the fund are 1 million ABCW stock shares at the new price of $0.80). The leveraged position of the fund caused a greater decline in the AUF share price than the price of the stock and also a greater decline in the AUF share price than would have been the case had the co-conspirators not sold their shares in the fund.

O'Neal Report, dkt. 167, at ¶10.

(O'Neal provided another hypothetical in which he explained how dilution also occurs in the converse situation when the employees buy ahead of a stock price increase. *Id*. at ¶11.)

Using this analysis, O'Neal prepared a trade-by-trade calculation of the dilutive harm to the Fund as a result of the allegedly collusive trades between Hofer and his two alleged co-conspirators, restricting his analysis to 23 trades that in total amounted to 10% or greater of the total outstanding shares in the Fund. *Id*. at ¶¶14-16 and Exh. 3. In making this calculation, O'Neal considered the "dilution period" after any collusive trade to be the period of time between the trade and a subsequent trade by either the co-conspirators or the trustee. The sum of O'Neal's dilution calculation across all 23 of these trades is $1.29 million. *Id*.

Importantly, O'Neal explained that his damages calculation was *not* dependent on a showing that the employees had manipulated the market and affected the price of ABCW stock as a result of their combined, large-volume trades:

> Note that the trade-by-trade dilution calculation does not assume nor rely on whether the collusive trading caused the adverse price movements in ABCW stock. This dilution is the direct result of the co-conspirators' collusively and strategically trading in anticipation of large subsequent movements in ABCW stock. Whether or not the AUF trading of ABCW necessitated by the co-conspirators' trades in the AUF caused declines or increases in the price of ABCW stock, the buy-and-hold AUF shareholders were harmed by the dilutive nature of the co-conspirators' trades.

> *Id*. at ¶19.

After Hofer filed his summary judgment brief in which he criticized plaintiffs for failing to quantify any loss sustained as a result of trustee trading on the five days identified in O'Neal's event study, O'Neal submitted a declaration explaining that the five days "represent a subset of the total dilutive harm caused by the twenty-three collusive trades" that he used in his dilution calculation. Dec. of Edward O'Neal, dkt. 151, at ¶7. Extracting from his dilution calculation the numbers he had reached for each of the five days identified in his event study, O'Neal arrived at a sum of $491,452. *Id*. at ¶8. In other words, the measure of damages O'Neal used to calculate the loss to the Fund from the five trading days on which he had found the employees' trades had affected the stock price is the same dilution analysis that he used for the remaining 18 trading periods for which no causal connection existed between the employees' trades and the ABCW stock price.

OPINION

## I.  Hofer's Motion for Partial Summary Judgment on Plaintiffs' Securities Fraud Claims

Plaintiffs' second amended complaint alleges that Hofer violated Section 9(a) of the

Securities Exchange Act of 1934.  To succeed on this claim, plaintiffs must prove that:

(1) a series of transactions in a security created actual or apparent trading in that security or raised or depressed the market price of that security;

(2) the transactions were carried out with scienter;

(3) the purpose of the transactions was to induce the security's sale or purchase by others;

(4) the plaintiffs relied on the transactions; and

(5) the transactions affected the plaintiff's purchase or selling price.

*Anchorbank, FSB v. Hofer*, 649 F.3d 610, 617 (7th Cir. 2011) (citing *Chemetron Corp. v. Business Funds, Inc.*, 682 F.2d 1149, 1164 (5th Cir. 1982), *vacated on other grounds*, 460 U.S. 1007 (1983)).[10]

---

[10] Section 9(a)(2) of the Securities Exchange Act, codified at 15 U.S.C.A. § 78i(a)(2)), provides:

(a)  Transactions relating to purchase or sale of security

It shall be unlawful for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange—

(2) To effect, alone or with one or more other persons, a series of transactions in any security registered on a national securities exchange . . . creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

Section 9(e) of the Securities Exchange Act creates a private cause of action for violations of Rule 9(a). It provides:

(e) Any person who willfully participates in any act or transaction in violation of subsection (a), (b), or (c) of this section, shall be liable to any person who shall purchase or sell any security at a price which was affected by such act or transaction, and the person so injured may sue in law or in equity in any court of competent jurisdiction to recover the damages sustained as a result of any such act or transaction.

Plaintiffs also allege that Hofer violated Section 10(b) of the Act, 15 U.S.C. § 78(b), and its implementing regulation, Rule 10b-5, 17 C.F.R. § 240.10b-5. To defeat Hofer's motion for summary judgment on this claim, plaintiffs must adduce evidence from which a reasonable jury could find: (1) a material misrepresentation or omission by the defendant in connection with the purchase or sale of securities; (2) scienter; (3) reliance; (4) economic loss; and (5) loss causation. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)). Plaintiffs' 10(b) claim rests on the same theory of market manipulation alleged in their 9(a) claim.

In conjunction with his reply to his motion for summary judgment, Hofer has moved for an order striking plaintiffs' summary judgment response brief and dismissing their federal securities law claims. Dkt. 174. Hofer argues that plaintiffs' "dilution" theory of harm as described in O'Neal's report and pressed in plaintiffs' brief is a brand new theory that cannot fairly be reconciled with the allegations in their complaint. As Hofer points out, plaintiffs' initial theory of liability as asserted in the second amended complaint was that Hofer and his alleged cohorts had artificially manipulated the market by (a) combining their trades, which upset the cash-to-stock ratio in the Fund, which (b) "forced" the trustee to buy and sell ABCW stock in amounts sufficient to stimulate the market and inflate or deflate the price of ABCW stock, which (c) caused harm to the Fund's trustee and Fund participants who unknowingly bought or sold Fund shares or ABCW stock at these artificially inflated or deflated values; however, plaintiffs' new "dilution" theory does *not* depend on a showing that Hofer's activity had an effect on the price of ABCW stock.

In response, plaintiffs admit—as they must—that their dilution theory does not depend on showing adverse price movements of ABCW stock as a result of collusive trading.

Nonetheless, they deny that this showing has ever been critical to their fraud theory. According to plaintiffs, "the concept at the core of this case since its inception [is] that the co-conspirators' trades caused the Fund trustee to trade, and the Fund shareholders were harmed as a result of this collusive trading, regardless of whether the price of ABCW stock on the open market changed as a result of the collusive trades." Pltfs.' Br. in Opp. to Mot. to Strike, dkt. 179, at 2-3.

This is sophistry. Consider the following allegations from plaintiffs' second amended complaint, dkt. 50, listed by paragraph number:

(25) The number of AUF shares being traded as a result of the collusive trading by the co-conspirators, in turn, caused the volume of ABCW stock sales to be relatively high as compared to the average daily trading volume of ABCW stock. Given the large volume of stock being sold at or around the same time, the ABCW stock price declined;

(30) The number of AUF shares being traded as a result of the collusive trading by the co-conspirators, in turn, caused the volume of ABCW stock purchases to be relatively high as compared to the average daily trading volume of ABCW stock. Given the large volume of stock being purchased or around the same time, the ABCW stock price increased;

(32) Other Fund participants made purchase or sales decisions "in reliance on the artificially high or low AUF share price and ABCW stock price," which in turn caused Fund to purchase or sell ABCW stock on open market "at prices that were artificially high or artificially low as a direct result" of Hofer's collusive trading activity;

(44) Hofer knew that his trading activity and the Collusive Trading Scheme had the ability to, and was in fact intended to, affect the AUF share price and, indirectly, the ABCW [stock] price;

(47) By early 2009, Hofer and his co-conspirators had amassed a large enough percentage value of Fund such that they were able to "measurably affect the ABCW share price;

(56)     As evidenced by **Exhibits A-D**, there is a measurable correlation between these large, coordinated purchases and sales of AUF shares and the change in the ABCW stock price;

(58)     Hofer and the other two co-conspirators engaged in the Collusive Trading Scheme knowingly and with the intent to affect the ABCW stock price and, as a result, induce others to purchase and/or sell stock;

(62)     As a direct result of the Collusive Trading Scheme, Hofer and the other co-conspirators were able to create the appearance of heightened trading activity and artificially inflate or deflate the ABCW stock price by forcing the trustee to purchase or sell ABCW stock shares on the open market to keep the AUF cash-stock ratio in balance;

(63)     The Trustee . . . relied on these "artificially high or low prices" when deciding how many shares of stock to buy or sell and when to trade;

(66)     Plan participants M and H relied on ABCW stock price and appearance of heightened market activity when they decided to sell their AUF shares in June 2009;

(77)     Hofer violated Rule 9(e) of Securities Exchange Act by effecting series of transactions in the Fund which indirectly required trustee to purchase stock on national exchange which ultimately "raised and lowered the price of ABCW stock;

(80)     Hofer violated Rule 10(b) of Securities Exchange Act by engaging in a scheme to "indirectly manipulate[] the ABCW stock price.

Contrary to plaintiffs' latest assertion, the core of this lawsuit since its inception has not been that Hofer engaged in a scheme of collusive trading that harmed the Fund participants by forcing the trustee to trade, *simpliciter*; rather, plaintiffs' theory of liability has been that the Fund was harmed because the trustee was forced to trade, *which in turn artificially inflated or deflated the ABCW stock price*.

Plaintiffs' newly-offered dilution theory not only abandons this key element of price manipulation, it abandons the need to show trading by the Fund trustee on the open market *at*

*all*. In response to Hofer's argument on this point, plaintiffs say only that O'Neal never said trustee trading was irrelevant. At the same time, however, plaintiffs do not identify anywhere in O'Neal's report or deposition where he said trading *does* matter, nor do they propose their own theory as to why trustee trading on the Stock Exchange causes or exacerbates the dilutive effect of a well-timed Fund trade. Plaintiffs offer only a citation to paragraph 14 of O'Neal's report, where he explains his method for calculating periods of dilution. This explanation shows that, although O'Neal did account for trustee trading in performing his calculation, he did so only for the purpose of determining the end point of the dilution period following a large trade by the co-conspirators. Specifically, O'Neal decided to count dilution damages caused by the alleged collusive trading for each day following the alleged collusive trade until either the trustee *or* the co-conspirators traded in the opposite direction. Read in context, O'Neal's reference to trustee trading was only for the purpose of measuring dilution *periods*; it provides no support for plaintiffs' suggestion that such trading *causes* dilution.

As O'Neal explained, dilution occurred as a result of the co-conspirators "guessing right" about the direction in which the price of ABCW stock was headed: when the co-conspirators traded in the Fund in those instances, the Fund had a leveraged position prior to stock price declines and a short position prior to stock price increases. Although O'Neal did not come out and say it, it is plain that the reason the Fund has a leveraged or short position, as the case may be, is because the Fund guarantees payment to participants for trades of Fund shares based on the price of a Fund share at the end of the day. Nothing in O'Neal's analysis suggests that the trustee must trade on the open market in response to the employee trades before dilution can occur.

31

Plainly, the theory of liability that plaintiffs now advance on summary judgment—which depends neither on the trustee having been "forced" to enter the market *nor* on the creation of an artificial disparity in the price of ABCW stock—is a dramatic change from the market manipulation theory asserted in their complaint and argued in numerous briefs at the pleading stage, both here and in the court of appeals.[11]  Although striking plaintiffs' response brief would be an appropriate sanction, it is unnecessary to do so because Hofer wins no matter what.

By jettisoning the link between Hofer's Fund trades and heightened market activity, plaintiffs are left with a claim that does not amount to securities fraud.  The most plaintiffs can show is that Hofer took advantage of a "loophole" that permitted him to exploit the cash-to-stock balance in the Fund to his advantage and, unfortunately, to the detriment of the non-trading Fund participants.  Even if plaintiffs could establish this conduct was deceitful, however, "[i]nvestors injured by fraud may recover under federal securities law only if the deceit caused them to purchase or sell securities."  *Anderson v. Aon Corp.*, 614 F.3d 361, 363 (7th Cir. 2010) (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975)).  No such causation has been shown here.

Plaintiffs attempt to salvage their case by pointing out that they *have* adduced proof that the allegedly collusive trades engaged in by Hofer and his alleged co-conspirators caused a disparity in the price of ABCW stock on five days.  O'Neal's event study, however, fails to establish either causation or loss.

---

[11] Plaintiffs seem to be under the impression that the Court of Appeals green-lighted this theory because "its discussion of how the scheme worked also recognized the dilutive effect of [Hofer's] trading." Br. in Opp. to Mot. to Strike, dkt. 179, at 4 (citing *Hofer*, 649 F.3d at 618).  That may be so, nothing in the court's opinion to suggests that plaintiffs can establish a claim of market manipulation without showing that something Hofer did affected the market.

First, plaintiffs have not adduced facts sufficient to show that either the Fund trustee or any individual participants bought or sold ABCW stock (or Fund units) in reliance on the price of ABCW stock on the five days identified in O'Neal's study. As Hofer points out, the fraud-on-the-market theory recognized in *Basic Inc. v. Levinson*, 485 U.S. 224, 243-47 (1988), permits an investor to recover damages only where the investor buys or sells a security in reliance on a price which has been impacted by fraud and he trades without knowledge of the fraud. Although the Court held that reliance on price integrity can be presumed, 485 U.S. at 248, that presumption can be rebutted by "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." Where a trader sells for a reason unrelated to the integrity of market, because of potential anti-trust problems, political pressure or because he simply needs the cash, for example, there is no reliance on market integrity. *Id*. at 249.

In their Second Amended Complaint, plaintiffs identified participants M and H as examples of participants who sold AUF shares "[i]n reliance on the ABCW market price." Dkt. 50, ¶66. However, M and H did not even trade on any of the five days identified by O'Neal. Obviously and ineluctably, they could not have traded in reliance on an artificially inflated or deflated stock price when they did not trade at all. Recognizing this gaping hole in their theory of liability, plaintiffs now recharacterize the nature of M and H's reliance, asserting that M and H are examples of participants who traded Fund shares "without knowledge of the dilution of the Fund" created by Hofer and the other employees. Dkt. 146, at 14. However, plaintiffs do not suggests that the "dilution of the Fund" is something that would have been reflected in the price of ABCW stock on the days that H and M traded. To prove the securities fraud claims

33

that they have asserted in their complaint, plaintiffs must show reliance on market integrity. They have failed to do this as to any individual participant in the Fund.

Plaintiffs fare no better with respect to the trustee's trading decisions on the five days in question. Plaintiffs offer Plumb's declaration to show that on March 27, 2009, he relied on the price of ABCW stock on the market when he sold 105,000 shares of ABCW stock on March 27, allegedly in response to 234,000 Fund shares sold by Hofer and his alleged co-conspirators the preceding day, March 26, 2009. Decl. of Tom Plumb, dkt. 153. Putting aside for the moment the lack of detail showing that Plumb was "forced" to trade on March 27, 2009 as a result of the employees' trades the preceding day, O'Neal's report makes clear that it was only after the *trustee* traded that the price of ABCW stock increased or decreased artificially. O'Neal Report, dkt. 167, at 10, ¶26 ("I used my regression model to predict the returns on ABCW stock on the 50 trading days in which the fund traded in response to trades from the co-conspirators."). Thus, Plumb's trading on March 27 could not have been in reliance on any artificial price disparity created by the employees' trades, because that disparity did not arise until *after* he traded.[12]

The only other date Plumb identifies as one on which he traded in reliance on the price of ABCW stock in the market is March 31, 2009, when Plumb asserts he relied on the market price of ABCW stock that day. However, O'Neal did not identify March 31, 2009 as a day on which the price of ABCW stock was impacted by the employees' trades. Perhaps plaintiffs are attempting to show that Plumb's March 31, 2009 trade occurred in the wake of the price

---

[12] Plaintiffs offer no response to Hofer's argument that any trades made by the Trustee after May 18, 2009, could not have been in reliance on market integrity because the Trustee was restricted under the terms of the Sponsor Agreement to trading only in order to maintain the Fund's cash balance. *See* Def.'s Br. in Supp. of Summ. Judg., dkt. 137, at 21. Accordingly, they have conceded that point. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) (failure to respond to opposing side's argument constitutes waiver).

disparity created by his March 27 trade, *see* Op. and Order, dkt. 60, at 5, (indicating that to show reliance, plaintiffs would need to show that "one or more of the Fund's forced trades occurred in the wake of a previous forced trade that affected the market"), but they make no argument to this effect. This court will not make their argument for them.

Furthermore, Plumb never explains *why* he traded on any given day that he traded. The crux of plaintiffs' entire theory, as alleged in their complaint, is that Hofer and his alleged cohorts knowingly combined trades in order to knock the cash/stock ratio out of balance and "force" the trustee to enter the stock market. Yet Plumb offers only general assertions about why he traded, stating that he did so in order to "keep the performance of the [Fund] as close as possible to the performance of ABCW stock," and that he "typically retain[ed] a small balance of $75,000 to $100,000 of cash" in the Fund. He never states that he was required by Anchor to maintain any particular ratio, much less the 5-11% ratio alleged by plaintiffs in their complaint, nor does he specify what the ratio was on any given day that he traded. Further, Plumb does not explain why he traded over a multiple day period, creating the risk that he would get caught in his own wake, rather than trading all in one day. Absent such evidence, plaintiffs cannot establish a loss that was proximately caused by Hofer's trades in the Fund.

Finally, plaintiffs have failed to calculate an alleged loss resulting from trustee trading on or after the five days identified by O'Neal in his event study. As the Supreme Court made clear in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005), the mere fact that the price of a security might have been artificially inflated on the date the plaintiff purchased is not sufficient in itself to establish the necessary requirement that the plaintiff show loss causation. O'Neal did not attempt to account for the "tangle of factors" affecting price, *id*. at 343; he

merely applied his dilution analysis, which explicitly does *not* depend on price disparity. Indeed, the only loss plaintiffs attempt to show is not from buying and selling stock on the Exchange, but from buying and holding in the Fund. This is not a recoverable loss under the securities laws. 15 U.S.C. §§ 78i(a), (e) and 78j(b) and SEC Rule 10b-5.

In sum, plaintiffs have not generated the proof necessary to support a number of key facts upon which they constructed their theory that Hofer indirectly manipulated the stock market through his combined Fund trades. Hofer is entitled to summary judgment on plaintiffs' securities fraud claims.[13]

## III. Plaintiffs' Motion for Summary Judgment on Hofer's Counterclaims

Hofer has alleged four counterclaims against plaintiffs: (1) retaliation and interference with his rights under the Employees Retirement Income Security Act, 29 U.S.C. § 1140; (2) extortion; (3) abuse of process; and (4) wrongful discharge under Wis. Stat. § 103.455. It appears from Hofer's opposition to plaintiffs' summary judgment motion that he is asserting his ERISA and abuse of process claims against both plaintiffs, whereas his extortion and wrongful discharge claims appear to be directed solely at Anchor.

---

[13] This court is aware of its obligations to make Rule 11 findings under 15 U.S.C. § 78u-4(c). Briefing on that issue shall be set at the conclusion of trial on Hofer's counterclaims.

## A.  Interference with ERISA rights

Section 510 of ERISA, 29 U.S.C. § 1140, states that:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline or discriminate against a participant or beneficiary [in an ERISA plan] for exercising any right to which he is entitled [under the provisions of his plan or under ERISA] . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . .

To prevail on a claim under this statute, Hofer must show: 1) that he was a participant in an ERISA plan; 2) he was discharged, fined, suspended, disciplined or discriminated against; 3) because of his exercise of his rights under the plan, or for the purpose of interfering with attainment of rights under the plan.  *Deeming v. American Standard, Inc.*, 905 F. 2d 1124, 1127 (7th Cir. 1990).  As the court of appeals explained in *Nauman v. Abbott Laboratories*, 669 F.3d 854,(7th Cir. 2012),

> [P]laintiffs claiming a violation of § 510 must establish more than a loss of benefits; they must demonstrate that their employers [acted] with the specific intent of preventing or retaliating for the use of benefits.  In other words, employers must have been motivated by a desire to frustrate attainment or enjoyment of benefit rights.

> *Id.* at 857 (Internal citations and quotations omitted).

The fact that an employer may take action against an employee that *results* in a loss of ERISA rights is insufficient; the loss of ERISA rights must have been what motivated the employer.  *Lindemann v. Mobil Oil Corp.*, 141 F.3d 290, 295 (7th Cir. 1998).  When a defendant proffers a legitimate reason for the employment action that is unrelated to depriving the employee of benefits, the inquiry ends unless the employee can show that the proffered reason is a pretext for improperly denying benefits.  *Isbell v. Allstate Ins. Co.*, 418 F.3d 788, 796 (7th Cir.

2005). An employee can meet his burden of showing pretext by coming forward with "evidence of specific facts that call into question the veracity" of the employer's proffered reasons. *Hague v. Thompson Distribution Co.*, 436 F.3d 816, 827 (7th Cir. 2006) (applying *McDonnell Douglas* burden-shifting analysis in context of racial discrimination).

Hofer contends that plaintiffs interfered with his ERISA rights in three ways: (1) by suspending his ability to invest in the Fund through his § 401(k) account on June 29, 2009, and then later, by imposing limits on his trading that were different than those they imposed on other plan participants; (2) by seeking to deprive him of more than $400,000 from his § 401(k) account; and (3) by suspending or constructively discharging him from his employment.

Plaintiffs do not deny that their actions with respect to Hofer's § 401(k) plan and employment interfered with Hofer's rights under ERISA. They contend, however, that they did so for legitimate, nondiscriminatory reasons, namely, because they believed Hofer had engaged in a manipulative trading scheme that had distorted the Fund to Hofer's advantage and in doing so, had violated Rules 9(a) and 10b-5 of the Securities Exchange Act as well as state statutory and common laws. Plaintiffs contend that even though they might have been wrong, Hofer has no evidence from which a jury could conclude that their reason was not honest. I disagree.

As an initial matter, no reasonable jury could fault plaintiffs for initially suspending Hofer's trading activity in the Fund until they could follow up on their suspicion that what Hofer and his alleged coconspirators had done was unlawful. Additionally, no reasonable jury could find that plaintiffs did not honestly believe that Hofer's trading activities had allowed him to make huge gains in the Fund to the detriment of the nontrading, buy-and-hold investors in the Fund. So far, so good for plaintiffs. But a reasonable jury *could* conclude that plaintiffs'

asserted belief that Hofer had committed securities fraud contains enough "weaknesses, implausibilities, inconsistencies, or contradictions" such "that a reasonable person could find [it] unworthy of credence." *Coleman v. Donahoe*, 667 F.3d 835, 853 (7th Cir. 2012) (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007)).

The weaknesses and implausibilities in plaintiffs' theory are abundant; I highlight just a few. First, as discussed in Section I of this Opinion, *supra*, plaintiffs have put forth no evidence to establish the following facts, which were essential to their claim that Hofer committed securities fraud: (1) that the trustee was required to maintain a specific ratio of cash to stock in the Fund prior to May 18, 2009; (2) that Hofer and his alleged coconspirators knew about this ratio; (3) that any of the trades by the employees "forced" the trustee to trade to restore the ratio on any particular day; (4) that any allegedly forced trades by the trustee were made in the wake of a previous forced trade that had resulted in an artificial increase or decrease in the price of ABCW stock; and (5) that the Fund or any individual participant suffered any economic loss as a result of buying or selling stock at an artificially inflated or deflated price. These facts were necessary to plaintiffs' theory of securities fraud, and more salient to the instant analysis, they depended on and were ascertainable from evidence within plaintiffs' possession. Reasonable jurors could find from this lack of supporting evidence that there came a point at which plaintiffs no longer had an honest belief that the facts supported their never-withdrawn accusations of fraud.

Second, plaintiffs' theory of securities fraud depended on Hofer, "A," and "B" having some degree of control over the trustee's trading activity, along with the knowledge necessary to exercise that control. To do this, the employees would have needed some understanding of

what would cause the trustee to trade on the Exchange. However, it is undisputed that all they knew about the mechanics of the Fund was that it had a cash component and that generally this cash component was about 1-3% of the total assets in the Fund. The employees did not know: the "required" ratio or "target" ratio of cash-to-stock that the trustee was supposed to maintain in the Fund (indeed, there was none before May 2009, and even then the ratio was not communicated to Fund participants); what that ratio was on any given day on which the employees traded; when the trustee traded in response to employee trades; the number of trading days available to the trustee; or, whether trades by one participant cancelled out the trades of another participant. As above, these are not points that plaintiffs could not have known until they undertook discovery in this lawsuit: before plaintiffs accused Hofer of securities fraud plaintiffs knew what information about the mechanics of the Fund had (and had not) been provided to employees. From this, a reasonable jury could conclude that plaintiffs did not honestly believe that Hofer, A and B, armed only with the knowledge that the Fund had a small cash component, could have devised and successfully executed the complex, multi-step market manipulation scheme alleged in plaintiffs' complaint and advocated by plaintiffs as justification for interfering with Hofer's ERISA rights.

I am also satisfied that the conflicting evidence could allow reasonable jurors to question whether plaintiffs were reasonable in thinking that Hofer had engaged in a "collusive scheme" to affect stock price at all, notwithstanding the number of times the employees may have traded on the same days or the frequency of their communications. Plaintiffs had no evidence to suggest that the employees were attempting to "hide" their transactions from the trustee; as Plumb admits, he received a report of all the transactions made in the Fund on a daily basis.

Further, both Hofer and one of his alleged co-conspirators contacted the Fund administrator in March 2009 to inquire about issues in the Fund. A reasonable jury could question whether plaintiffs reasonably believed that Hofer was "scheming" to defraud the trustee when the trustee had real-time notice of all of Hofer's transactions and Hofer and one of his alleged co-conspirators acknowledged that they were watching the Fund and the price of ABCW stock. Plaintiffs point to the emails between Hofer and B as evidence supporting their belief, and perhaps a jury will accept this; but none of the emails contains any hint that the employees were trading with the intent to affect the price of ABCW stock on the open market, which means that it would be premature to say that Hofer's ERISA claim is so unsupported as to merit summary judgment.

The only evidence to which plaintiffs point that specifically relates to a scheme to manipulate the price of ABCW stock–as opposed to merely a scheme to amass Fund shares—is an alleged statement by Hofer to another employee (who was not an alleged conspirator) that he should not trade on a certain day because it would affect Hofer's "price." Hofer denies making this statement, but of course that does not matter; for pretext purposes, the operative question is whether Hofer's alleged statement afforded plaintiffs a reasonable basis for their conclusion that Hofer had committed securities fraud. Viewing the evidence in Hofer's favor, as I must, I am satisfied that a reasonable jury could answer this question in the negative. Hofer's alleged statement actually cuts against plaintiffs' fraud theory, which posited that Hofer and his alleged co-conspirators had intentionally combined trades in order to increase the volume of ABCW stock subsequently traded on the Exchange in order to artificially affect the stock price. As Hofer points out, under the scheme envisioned by plaintiffs, it would have *benefitted*

Hofer to have increased trading volume; furthermore, another employee's trade could not affect Hofer's price because he received the price of ABCW stock at the close of the market on the day he traded.

In any case, I am not persuaded that this one piece of evidence insulates plaintiffs from a jury trial on the question of pretext. Given the other weaknesses in plaintiffs' theory and explanation, I am satisfied that a reasonable jury could find that plaintiffs did not honestly believe that Hofer had committed securities fraud. Lending support to this conclusion is McPeak's "loophole" statement, which could be viewed by a jury as an admission that plaintiffs' limp trading rules were a root cause of the damage to non-trading Fund participants; this would be another reason for a jury to doubt the sincerity of plaintiffs' belief. Maybe Hofer will meet his burden of persuasion on this dispute at trial, maybe not, but the dispute is genuine and material, so Hofer is entitled to put it in front of a jury. Plaintiffs' motion for summary judgment on Hofer's claim of ERISA interference and retaliation will be denied.

## B. ERISA Claim for Benefits Due

In his opposition to plaintiffs' summary judgment motion, Hofer raises another legal theory under which he is entitled to recover under ERISA: § 502(a)(1)(B), codified at 29 U.S.C. § 1132(a)(1)(B). That subsection permits a plan participant or beneficiary to sue "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." It provides a remedy to one who "is in fact entitled to benefits under a plan and does not receive them for *any* reason, malicious or not." *Teumer v. General Motors Corp.*, 34 F.3d 542, 545 (7th Cir. 1994).

As an initial matter, I note that Hofer's failure to specifically invoke § 502(a)(1)(B) in his counterclaims is not fatal to his pursuit of the claim on summary judgment. His counterclaim states a set of facts adequate to support relief under § 502(a)(1)(B). *See* Hofer's Answer and Aff. Defenses to Sec. Amended Cmplt. and Amended Counterclaims, dkt. 112, ¶¶ 21-22, 72-76. Under the liberal notice pleading rules, it does not matter that Hofer might not have identified all the legal theories that might govern his claims. *Teumer*, 34 F.3d at 545.[14]

The merits of Hofer's claim require minimal discussion. Plaintiffs argue that Hofer's § 502(a)(1)(B) claim must fail because the § 401(k) profits that they sought to obtain from him were obtained by him in violation of federal security laws. Obviously, this court has found to the contrary. Plaintiffs are not entitled to summary judgment on this claim.

## C. Extortion

Hofer alleges that Anchor attempted to extort him in violation Wis. Stat. § 943.30, a criminal statute that imposes felony-level punishment. Anchor seeks summary judgment on several theories, but it neither asks nor answers the first question that occurs to the court: does §943.30 provide a private right of action under Wisconsin tort law? As best I can discern, the answer is "no."

I have not found any Wisconsin case recognizing a tort of "extortion." Wisconsin does recognize the doctrine of business duress as a defense to a claim in contract, *see Wurtz v.*

---

[14] Lest plaintiffs think the court is applying a double standard to the adequacy of the parties' pleadings, Hofer has pled the facts that support this claim but he failed to cite the operative statute, while plaintiffs pled facts that contradict and impeach their current assertion that this case always has been about dilution regardless of market manipulation. Further, as noted above, plaintiffs have not adduced evidence sufficient to avoid summary judgment on their dilution theory.

*Fleischman,* 89 Wis.2d 291 (Ct. App. 1979), *rev'd on other grounds* 97 Wis.2d 100 (1980), but that is not what Hofer is claiming here and the facts do not match up with the elements of business duress. I also found a Wisconsin case that recognizes a private civil cause of action based on Wis. Stat. § 134.01, but this is a narrowly-tailored misdemeanor conspiracy statute aimed at restraints of trade. *See Radue v. Dill,* 74 Wis.2d 239, 245 (1976), *cited in Virnich v. Vorwald*, 664 F.3d 206, 212-13 (7th Cir. 2011)(also noting that there are pattern civil jury instructions regarding conspiracy at WI-JI–Civil 2820).[15]

In contrast, the Court of Appeals for the Seventh Circuit in *Stanard v. Nygren*, 658 F.3d 792 (7th Cir. 2011) characterized as "obviously frivolous" plaintiffs' attempt to sue a county sheriff under the Hobbes Act (federal extortion), "a criminal statute that does not provide a private right of action." *Id.* at 794. *See also Ragsdale v. Turnock*, 941 F.2d 501, 509 (7th Cir. 1991)(Posner J., concurring in part and concurring in the judgment)("private persons have no right . . . to enforce criminal or other regulatory statues, unless of course the statutes also create private rights of action, which this one does not"); *Jackson v. United Migrant Opportunity Services*, 326 Wis. 2d 265, ¶10 (Wis. App. 2010) (*unpublished opinion*) ("Wis Stat. § 947.013, which criminalizes certain harassing behavior, does not create a private cause of action . . ."). From all this, I conclude that Hofer, as a private citizen, cannot bring a civil claim of extortion pursuant to § 943.30 against Anchorbank. On this basis I am granting summary judgment for AnchorBank on this claim. If Hofer wishes to pursue his claim of extortion, then he should report this matter to the Dane County District Attorney.

---

[15] I also can hypothesize a civil RICO claim with Hobbes Act violations as predicate acts, but this is not Hofer's claim.

Given this conclusion, there is no need to analyze AnchorBank's actual arguments for summary judgment or Hofer's response thereto. Because this decision is based on the court's sua sponte analysis of the law, I will allow Hofer one week from the date of this order in which to request reconsideration. Hofer must accompany any such request with a terse brief (no more than four pages) citing statutes or case law establishing that a private party like Hofer may file a civil claim based on Wis. Stat. § 943.30.

### D. Abuse of Process

Abuse of process is a tort that occurs when someone "uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed . . . " *Schmit v. Klumpyan*, 2003 WI App 107, ¶ 6, 264 Wis.2d 414, 663 N.W.2d 331. A plaintiff must prove two elements to establish an abuse of process: 1) a purpose other than that which the process was designed to accomplish, and 2) a subsequent misuse of the process. *Id.*, ¶ 7.

To prove this second element, there must be a "wilful act in the use of process not proper in the regular conduct of the proceedings." *Brownsell v. Klawitter*, 102 Wis.2d 108, 115, 306 N.W.2d 41 (1981). This element requires evidence of "[s]ome definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process . . . and there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions." *Thompson v. Beecham*, 72 Wis.2d 356, 362, 241 N.W.2d 163 (1976). As the Wisconsin Supreme Court explained in *Thompson*:

> [T]he process must be used for something more than a proper use with a bad motive. The plaintiff must allege and prove that something was done under the process which was not warranted by its terms. The existence of an improper purpose alone is not enough, for this improper purpose must also culminate in an actual misuse of the process to obtain some ulterior advantage.

*Id.* at 363, 241 N.W.2d 163.

Put another way, the "gist of the tort" is "misusing or misapplying process justified in itself for an end other than that which it was designed to accomplish. The purpose for which the process is used . . . is the only thing of importance." *Maniaci v. Marquette University*, 50 Wis.2d 287, 299-300, 184 N.W.2d 168, 174-175 (1971) (quoting Prosser, Law of Torts (Hornbook series, 3d ed.), p. 876, sec. 115). *See also Nightingale Home Healthcare, Inc. v. Anodyne Therapy, LLC*, 626 F.3d 958, 963 (7th Cir. 2010) ("Unlike malicious prosecution, which involves filing a baseless suit to harass or intimidate an antagonist, abuse of process is use of the litigation process for an improper purpose, whether or not the claim is colorable."). "Because of its potential chilling effect on the right of access to the courts, the tort of abuse of process is disfavored and must be narrowly construed to insure the individual a fair opportunity to present his or her claim." *Wisconsin Public Service Corp. v. Andrews*, 2009 WI App 30, ¶ 19, 316 Wis.2d 734 766 N.W.2d 232 (quoting *Schmit*, 2003 WI App 107, ¶¶ 8-9, 264 Wis. 2d 414, 663 N.W.2d 331).

Examples of Wisconsin cases in which an abuse of process claim was found to lie was a husband's alleged use of a bench warrant for his wife in order to coerce her into granting visitation with their children, *Strid v. Converse*, 111 Wis. 2d 418, 426, 331 N.W. 2d 350 (1983), and the filing and obtaining of a detention order by university officials against a student where evidence showed they did so not for the purposes of inquiring into her mental condition, but

instead to physically prevent her from leaving school. *Maniaci*, 50 Wis. 2d at 301, 184 N.W. 168. The Wisconsin Supreme Court also has noted with approval Prosser's example of a defendant having the plaintiff arrested in order to compel him through duress to surrender the register of a vessel, without which the plaintiff could not go to sea. *Brownsell*, 102 Wis.2d at 113, 306 N.W.2d 41 (citing Prosser, Handbook of the Law of Torts § 121, at 856 (4th ed.1971)). In each of these examples, the improper purpose is not to harm the other party directly by bringing suit, but rather to use the process as a means to gain some other end indirectly.

Hofer argues that plaintiffs committed abuse of process in two ways: (1) by including in their First Amended Complaint a claim that Hofer had violated his non-solicitation agreement; and (2) by bringing and maintaining their claims for security law violations. Although a plaintiff alleging abuse of process need not show that the legal action brought against him was baseless, *see Maniaci*, 50 Wis. 2d, at 299, 184 N.W. 2d 168, here it is the alleged falsity of plaintiffs' allegations that forms the basis of Hofer's claim that plaintiffs "misused" the legal process when it sued him for breach of the non-solicitation agreement and for securities laws violations. I already have concluded that a reasonable jury could find that plaintiffs lacked a reasonable basis for their securities laws claims; with respect to plaintiffs' breach of contract claim, let's assume for the purpose of the instant analysis that it, too, is baseless. Plaintiffs nonetheless are entitled to summary judgment on Hofer's abuse of process claim because Hofer has not adduced evidence sufficient to support an inference that plaintiffs' primary motivation in filing either of these claims was to obtain some advantage collateral to the proceeding itself.

With respect to the non-compete agreement, Hofer contends that Osterholz all but admitted plaintiffs' improper purpose in filing the claim when he testified that it was a "legal strategy" to include it and that it did not "seem to be okay" that Hofer went to work for a competitor when Anchor had not terminated him and he had not resigned. According to Hofer, Osterholz's testimony shows that plaintiffs included the claim for two improper purposes: 1) to carry out a legal strategy; and 2) to act against Hofer for taking a job with a competitor. Indeed, Hofer thinks this evidence of ulterior motive is so clear that this court should grant summary judgment in *his* favor on this claim.

I disagree. Hofer infers too much from Osterholz's statements. As Anchor points out, just about any aspect of any complaint could be said to have been included because of "legal strategy." And Osterholz's statement that it did not seem to be okay that Hofer accepted a job with a competitor while still technically an Anchor employee is simply not enough from which to infer that Anchor included the claim primarily to cause Hofer to be fired from his job. As Anchor points out, if that had been its goal, it could have simply called Monona State Bank and informed it that Hofer was violating a non-compete agreement. Osterholz's testimony might be relevant to establish that Anchor was motivated by spite or ill will, but it does not establish that Anchor filed the claim for an unauthorized purpose.

I reach the same conclusion with respect to the securities fraud claims. Although I have found that a reasonable jury could conclude that plaintiffs lacked a reasonable belief that Hofer had committed securities fraud, Hofer falls short in adducing evidence from which a jury could conclude that plaintiffs filed a lawsuit alleging this claim for any purpose other than for which it was intended. Hofer posits that plaintiffs filed the claims for the purpose of attempting to

obtain from him over $400,000 "without a sufficient factual basis to believe that anyone but Mr. Hofer was entitled to the money," dkt. 162, at 20, but this is just another way of saying the claims were baseless.  The objective in any tort action is to ascertain liability and then damages in an amount that will make the injured party whole; simply because the factual basis for asserting a tort claim ultimately may be wanting does not show that the plaintiff had an ulterior motive.  This court routinely grants summary judgment motions in favor of defendants when the court finds that there is no genuine dispute of the material facts and the defendant is entitled to judgment as a matter of law, *see* F.R. Civ. P. 56(a).  Each such ruling implies that the plaintiff's case was so lacking in factual and legal support that it doesn't merit a trial.  This does not mean that every plaintiff who loses on summary judgment is liable to the winning defendant for abuse of process.

Hofer is free to argue that the lack of factual and legal support for plaintiffs' claims of securities fraud warrants the imposition of sanctions under the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(c).  To establish the tort of abuse of process, however, Hofer needs something more.  He does not have it.  Although Hofer suggests a number of improper ulterior motives that could be attributed to  Anchor–including attempting to damage his reputation in the community, preventing him from obtaining employment and making him a scapegoat for the trustee's own failure to monitor and regulate the Fund–Hofer has presented no evidence, direct or inferential, to support these theories.  True, a party's intent, unless admitted, has to be inferred rather than observed, *Washington v. Hively*, ___ F.3d ___, 2012 WL 3553419 at [3], (7th Cir. Aug. 20, 2012), but mere speculation is not enough to avoid summary judgment, *Hanners v. Trent*, 674 F.3d 683, 692 (7th Cir. 2012).  Accordingly, plaintiffs are entitled to summary judgment on this claim.

### E. Wrongful Discharge

Hofer was an at-will employee for Anchor. The doctrine of employment-at-will, which has been adopted in Wisconsin, means that an employer can discharge an at-will employee "for good cause, for no cause and even for cause morally wrong" without liability. *Tatge v. Chambers & Owen, Inc.*, 219 Wis. 2d 99, 112, 579 N.W. 2d 217 (1998). In *Brockmeyer v. Dun & Bradstreet*, 113 Wis. 2d 561, 573, 335 N.W. 2d 834 (1983), however, the Wisconsin Supreme Court adopted a "narrow" public policy exception to this rule, holding that "an employee has a cause of action for wrongful discharge when the discharge is contrary to a fundamental and well-defined public policy as evidenced by existing law."

The public policy exception permits at-will employees to sue for wrongful discharge "if they are fired for fulfilling, or refusing to violate, a fundamental, well-defined public policy or an affirmative legal obligation established by existing law." *Bammert v. Don's Super Valu, Inc.*, 2002 WI 85, ¶3, 254 Wis. 2d 347, 646 N.W. 2d 365; *Brockmeyer*, 113 Wis. 2d at 573. A discharge can also violate public policy if it violates the spirit, if not the letter, of a statute. *Wandry v. Bull's Eye Credit Union*, 129 Wis. 2d 37, 47, 384 N.W. 2d 325 (1986). In order to successfully make a claim under the public policy exception, the employee first must identify "a fundamental and well defined public policy in [his or her] complaint sufficient to trigger the exception to the employment-at-will doctrine," and then demonstrate that the discharge violated that fundamental and well-defined policy. *Strozinsky v. School District of Brown Deer*, 2000 WI 97, ¶¶ 36-37, 237 Wis. 2d 19, 614 N.W. 2d 443.

Hofer contends that his constructive discharge[16] violated the fundamental and well-defined public policy embodied in Wis. Stat. § 103.455, which provides:

**103.455. Deductions for faulty workmanship, loss, theft or damage**
No employer may make any deduction from the wages due or earned by any employee, who is not an independent contractor, for defective or faulty workmanship, lost or stolen property or damage to property, unless the employee authorizes the employer in writing to make that deduction or unless the employer and a representative designated by the employee determine that the defective or faulty workmanship, loss, theft or damage is due to the employee's negligence, carelessness, or willful and intentional conduct, or unless the employee is found guilty or held liable in a court of competent jurisdiction by reason of that negligence, carelessness, or willful and intentional conduct. If any deduction is made or credit taken by any employer that is not in accordance with this section, the employer shall be liable for twice the amount of the deduction or credit taken in a civil action brought by the employee. Any agreement entered into between an employer and employee that is contrary to this section shall be void. In case of a disagreement between the 2 parties, the department shall be the 3rd determining party, subject to any appeal to the court. Section 111.322 (2m) applies to discharge and other discriminatory acts arising in connection with any proceeding to recover a deduction under this section.

The Wisconsin Supreme Court has summarized the purpose of the statute as follows:

The entire purpose of the statute is to preclude any deduction for losses until the employee has an opportunity to show his lack of fault. An employer is not prohibited under the statute from deducting from an employee's wages those losses in business which are due to his negligence, carelessness or willful misconduct. However, he may do so only in accord with one of the methods provided by statute which are designed to protect the employee from arbitrary action.

*Donovan v. Schlesner*, 72 Wis.2d 74, 82, 240 N.W.2d 135 (1976).

---

[16] Anchor does not dispute that a reasonable jury could find that it constructively discharged Hofer when it suspended him without pay after he refused to disgorge his profits from the alleged trading scheme.

In *Wandry*, 129 Wis. 2d 37, 47, 384 N.W. 2d 325, a cashier brought a claim for wrongful discharge after her employer had fired her after she refused to reimburse it for damages sustained as a result of a check that she had cashed for a customer, not knowing that the check had been stolen and forged. Wandry contended that even though she was an at-will employee, her discharge was unlawful because it violated the public policy embodied in Wis. Stat. § 103.455. Recognizing that Bull's Eye had not violated the statute insofar as it had not deducted the amount of loss from Wandry's paycheck but was instead asking her to "reimburse it from [her] assets," the Wisconsin Supreme Court nonetheless allowed the claim for wrongful discharge to proceed. *Id*. at 46-47. The court explained that under *Brockmeyer*, the question was not whether the discharge was in violation of statute's explicit terms, but whether it violated the public policy *evidenced* in the statute, and therefore the public policy exception "may be invoked in contexts outside the precise reach of the statute." *Id*. The court found that

> [Section 103.455] articulates a fundamental and well-defined public policy proscribing economic coercion by an employer upon an employee to bear the burden of a work-related loss when the employee has no opportunity to show that the loss was not caused by the employee's carelessness, negligence, or wilful misconduct.

> *Id.* at 47.

Further, Wandry's complaint sufficed to establish a connection between her discharge and the public policy embodied in the statute:

> In this case the complaint alleges facts showing that the plaintiff-employee followed Bull's Eye's established procedures in cashing the check in issue and that she was not guilty of carelessness, negligence or wilful misconduct. We infer from the complaint that she was never given the opportunity to show that the work-related loss was not her fault, that Bull's Eye knew that she had no opportunity to show that the loss was not her fault, and that Bull's Eye was nevertheless seeking to impose the loss on

her. We read the complaint as alleging that the discharge resulted from the plaintiff-employee's refusal to pay for a work-related loss which the plaintiff-employee asserts was not her fault, although the employer failed to give her an opportunity to protect her right on the question of whether the loss was her fault.

*Id*. at 47.

Plaintiffs argue that cases decided after *Wandry* have "significantly narrowed" the scope of that decision and that Hofer's claim does not fall within these tighter confines. First, plaintiffs cite to *Batteries Plus, LLC v. Mohr*, 2001 WI 80, ¶3, 244 Wis. 2d 559, 628 N.W. 2d 364. In that case, Mohr's compensation package included a base salary and a commission of a percentage of the gross profits on all sales. Mohr used his own vehicle and was reimbursed by Batteries Plus for mileage expenses from August 1994 until April 1996. In 1996, Batteries Plus informed Mohr that it had mistakenly paid him for mileage expenses and asked him to agree to deductions from future wages in order to reimburse it for the overpayment. Mohr denied that he was overpaid, refused to pay back the money and the parties were unable to resolve the matter. Mohr's employment ended July 1, 1996, with Mohr claiming that he had been fired and the company claiming that Mohr had quit. *Id*, 244 Wis. 2d 559, ¶¶4-5.

After Batteries Plus sued him to recover the alleged overpayment, Mohr counterclaimed, alleging that he had been wrongfully discharged in contravention of the public policy embodied in Wis. Stat. § 103.455. The court disagreed. Although the court affirmed its decision in *Wandry* as "good law," Mohr's case had different facts: whereas the employer in Wandry had sought to make Wandry reimburse it for a work-related loss that it claimed was Wandry's fault, the dispute between Mohr and Batteries Plus involved an alleged overpayment of expenses, which was "in essence a dispute about compensation, historically a flashpoint in employer-

employee relations." *Id.*, ¶35. The court also noted that under the terms of Wis. Stat.

§ 103.455, the only way Batteries Plus could recover the alleged overpayment unless Mohr

agreed to the deduction from future wages was to sue him; Mohr's attorney had told Batteries

Plus that it would have to drop that option or Mohr would consider himself fired. *Id.*, ¶36. The

court was not willing to find that the public policy embodied in § 103.455 extended this far:

> We can foresee situations in which an employer is entitled
> legitimately to use its leverage to recoup money from an employee
> because of the overpayment of wages or expenses, or because of an
> employee's overextension of a monthly draw. Requiring an
> employer to go to court in every situation in which an employee
> disputes the alleged overpayment would undercut the employer's
> position and foster instability in the workplace. The employer
> cannot always be faulted for self-help when it attempts to settle a
> dispute with the employee and, failing that, takes action.

> *Id.*, ¶33.

The Wisconsin Court of Appeals affirmed the vitality of this rationale in a recent case,

*Sedlacek v. D. Mark Group, Inc.*, 2011 WI App 75, 334 Wis.2d 146, 799 N.W.2d 928 (Table)

(unpublished disposition), which involved facts nearly identical to those in *Batteries Plus*:

> Sedlacek was informed she was overpaid approximately $934 in
> wages. She refused to voluntarily repay any of those wages, and
> made clear her position that Manpower was not legally entitled to
> reimbursement for the overpayment. At its core, Sedlacek's
> termination is the result of a dispute over compensation. Her
> communications left no doubt that Manpower would have to
> initiate legal proceedings to recover the overpayment.
> Consequently, we conclude Sedlacek's termination does not violate
> any fundamental and well-defined public policy embodied within
> § 103.455.

> *Id.*, ¶15.

Plaintiffs argue that *Sedlacek* and *Batteries Plus* stand for two propositions that defeat

Hofer's wrongful discharge claim: 1) the public policy embodied in § 103.455 applies only to

"defective or faulty workmanship, lost or stolen property or damage to property;" and 2) "when an employer believes an employee has wrongfully obtained money and the employee refuses to pay the money back, the employer is not violating § 103.455 by discharging the employee." Pltfs.' Br. in Supp., dkt. 119, at 7.

Neither of these cherry-picked propositions is supported by a fair reading of the cases. To the contrary, *Batteries Plus* and *Sedlacek* simply hold that where the money the employer is seeking to recoup from the employee is due to an alleged overpayment by the employer and the employee refuses to pay the amounts requested, the employer's discharge of the employee does not violate the public policy embodied in § 103.455. Nothing in either opinion suggests that an employer may use self-help any time it believes the employee has wrongfully obtained "money" or that the public policy exemption may be claimed only when the loss at issue is of the specific type identified in the statute. As the court stated in *Wandry*, the public policy exception "may be invoked in contexts outside the precise reach of the statute." In any event, I am satisfied that Anchor's demand that Hofer reimburse it for the alleged damage he had done to the Unitized Fund is a claim of "lost or stolen property or damage to property."

Anchor's demand that Hofer disgorge monies allegedly obtained from (or at the expense of) other Fund participants was not a demand to recover amounts paid to him by mistake; it was a demand to recover amounts that Anchor contended it had lost as a result of Hofer's wrongdoing. Thus, the decisions in *Batteries Plus* and *Sedlacek* do not apply. Hofer's claim is akin to that made by the employee in *Wandry*, who was allowed to invoke the public policy exception. As the court noted in *Batteries Plus*, *Wandry* is still good law.

Taking a different tack, plaintiffs argue that the public policy exception embodied in § 103.455 applies only when the employee is seeking to recover "wages;" here, in contrast, Anchor was seeking Hofer's *profits* from his alleged trading scheme, not the money Hofer had contributed to his § 401(k) through his elections and plaintiffs' matching contributions. Although Hofer insists that Anchor's proposed disgorgement amount captured his wages, it is unnecessary to settle that debate because again, Anchor's view of the scope of the public policy exception is too narrow.

Anchor relies on the Wisconsin Court of Appeals' decision in *Farady-Sultze v. Aurora Medical Center of Oshkosh, Inc.*, 2010 WI App 99, 327 Wis. 2d 110, 117, 787 N.W.2d 433, 436. As in *Batteries Plus* and *Sedlacek*, Farady-Sultze's termination arose in the context of a dispute over excess compensation: for approximately four months, her employer had accidentally paid her wages for work performed at a location at which she had ceased working. *Id.*, 327 Wis. 2d 110, ¶3. After discovering its error, Aurora suspended Farady-Sultze and began an investigation, which culminated in her termination. *Id.* at ¶4. Farady-Sultze claimed that her discharge was in violation of public policy, relying on § 103.455. *Id.* at ¶7. After declaring that "[t]he public policy goal of the statute is to prevent the employer from arbitrarily deducting hard earned wages at its prerogative," *id.* at ¶9, the court wrote:

> Farady-Sultze does not begin to come under the statute. She never earned that sixteen hours of wages in Wautoma every pay period after she was reassigned. So, the goal of the statute, to protect earned wages, never came into play. Moreover, the purpose of the statute is to prevent unauthorized deduction from earned wages. There was no deduction of earned wages here. Therefore, despite her claim that she simply did not know that she was getting more wages than she was supposed to, the fact remains that her claim is not protected by public policy.
>
> *Id.* at ¶10.

Plaintiffs rely on the court's statement that the goal of § 103.455 is to prevent unauthorized deductions from "earned wages" as support for their contention that Hofer cannot invoke the public policy exception here because Anchor was not seeking to recoup Hofer's wages. Given the passage quoted above, plaintiffs' position is reasonable. Nonetheless, I am not convinced that *Farady-Sultze* is controlling. The court's shorthand statement of the purpose of § 103.455—"to prevent unauthorized deduction from earned wages"— which it makes with no citation, is difficult to reconcile with *Wandry's* much broader description of the statute's purpose, which it said was to "proscrib[e] economic coercion by an employer upon an employee to bear the burden of a work-related loss when the employee has no opportunity to show that the loss was not caused by the employee's carelessness, negligence, or wilful misconduct." 129 Wis. 2d at 46-47. Indeed, in *Wandry*, as in *Farady-Sultze*, the employer had not sought a deduction from Wandry's earned wages, but the court nonetheless found Wandry's claim to fall within the protection of the statute. *Farady-Sultze*'s focus on the explicit text of the statute departs from this reasoning.

Furthermore, although Farady-Sultze's claim would certainly have been barred under *Batteries Plus*, the court did not even mention that case in its decision. Indeed, although *Sedlacek* was decided after *Farady-Sultze*, the appellate panel that decided *Sedlacek* explicitly declined to rely on it, noting that Sedlacek's claim was barred as a matter of law by *Batteries Plus*. *Sedlacek*, at n.2. Thus, it appears *Farady-Sultze* is an anomaly in Wisconsin law rather than "a logical step in legal evolution." *Kutsugeras v. AVCO Corp.*, 973 F. 2d 1341, 1345 (7th Cir. 1992). Accordingly, it is not controlling. *See generally Affiliated FM Insurance Co. v. Trane Co.*, 831 F.2d 153, 155 (7th Cir. 1987) ("[A] federal court must apply the state law as declared by the highest state court or otherwise by the intermediate appellate court of the state. It has limited discretion

to adopt untested legal theories under the rubric of state law."); *A.W. Huss Co. v. Continental Cas. Co.*, 735 F.2d 246, 253 (7th Cir. 1984).  Even if Anchor was not attempting to deduct Hofer's wages, it was seeking to have him bear the burden of a work-related loss.  Pursuant to *Wandry*, Wis. Stat. § 103.455 applies to Hofer's claim.

In sum, because Hofer has alleged that his discharge resulted from his refusal to pay for a work-related loss which he asserts was not his fault and for which Anchor failed to give him the opportunity to prove that lack of fault, he may proceed on his wrongful discharge claim.

ORDER

IT IS ORDERED that:

1.  Defendant Clark Hofer's motion for partial summary judgment on plaintiffs' federal securities law claims, dkt. 123, is GRANTED.

2.  Plaintiffs' motion for summary judgment on defendant's counterclaims, dkt. 118, is GRANTED IN PART AND DENIED IN PART:

(a)  It is GRANTED with respect to defendant's claims for extortion and abuse of process; and

(b) it is DENIED with respect to defendant's claims for interference with ERISA rights and wrongful discharge.

3.  Defendant's motion to strike plaintiffs' response brief, dkt. 174, is DENIED as unnecessary.

4.  Defendant may have until September 27, 2012 to seek reconsideration of the court's decision on his extortion claim in the manner set forth in this order.

Entered this 20th day of September 2012.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge